265 So.2d 459 (1972)
LAFAYETTE AIRPORT COMMISSION et al., Plaintiffs-Appellees,
v.
J. Maxime ROY et al., Defendants-Appellants.
No. 3817.
Court of Appeal of Louisiana, Third Circuit.
May 26, 1972.
Dissenting Opinion June 12, 1972.
Rehearings Denied July 12, 1972.
Writs Refused September 27, 1972.
*463 Bailey & Mouton by William C. Hollier, Lafayette, Morgan J. Goudeau, III, Opelousas, Davidson, Meaux, Onebane & Donohoe by Edward C. Abell, Jr., Lafayette, for defendants-appellants.
William E. Logan, Jr., Lafayette, for plaintiffs-appellees.
Before FRUGÉ, HOOD and MILLER, JJ.
MILLER, Judge.
The Lafayette Airport Commission and the Lafayette Parish Police Jury expropriated[1] a 97 acre tract of land for extension of runways at the Lafayette Municipal Airport. Defendants A. J. Maxine Roy, Jr., and 15 other co-owners in indivision, owners-lessors appeal contending that the $39,043.79 award should be increased. Defendant-lessee Acadian Development Corporation appeals seeking recognition of the leasehold interest it owned at the date of the taking, and an award therefor. Plaintiffs answered the appeal seeking a reduction in the award to landowners to the sum of $24,240.75. We amend the trial court judgment to substantially increase the trial court's award to landowners. We reverse in part to recognize the leaseholder's interest and award leaseholder the fair market value of its ownership.
Defendants own 219.8 acres out of which 97 acres were taken effective January 30, 1970. The physical aspects of the subject land together with a characterization of the claims is shown on plaintiffs' exhibit "3" & "I." There is a 10.7 acre tract northeast of the area taken which was not expropriated but which is considered by most experts to be effectively taken by the expropriation.
Five test borings were made by T. L. James on the subject land, two by Capizola & Associates and forty by Eustis Engineering Co. These indicated a sand deposit extending along the entire western edge of the subject land, consisting of 33.3 acres found in the 97 acre tract and 0.8 acres in the aforementioned 10.7 acre tract.
On August 1, 1956, landowners granted to Acadian Development Corporation a recorded sand and gravel mining lease encompassing the entire 219.8 acre tract for a minimum annual rental of $1,000 plus a 10 cents per cubic yard royalty on all sand removed. On July 1, 1963 these parties, by unrecorded amendment to the lease, released all but 80 acres of the tract to landowners. Acadian retained 80 acres under the amendment (this included all of the 34.1 acre sand deposit) and was obligated to pay an annual minimum rental of $2,500 plus 22 cents per cubic yard royalty on all sand removed.
From 1956 to 1969, 856,689 cubic yards of sand have been removed and landowners have received $166,538.99 in royalties. In the seven years between January 1963 *464 and December 1969 Acadian removed 657,876 cubic yards of sand for an annual average of 93,982 cubic yards. A total of $145,766.59 was paid to landowners during this period. The average annual yield from the property for the seven years prior to this taking was $20,824.
It was established that coarse sand which is found on this tract was unique and had a substantially higher value than fine sand. Fine sand suitable only for fill purposes is found to a depth of 35' from the surface and coarse sand suitable for concrete, asphalt, and mason mix is encountered at 35' and extends to a substantial depth below that. The overburden ranges from 0 to 10 feet and has been removed from 47% (16.1 acres) of the 34.1 acre sand deposit. This leaves 18 acres of sand deposit with overburden and fine sand in place.
The fine sand found to a depth of 35' (25' of sand plus 10' of overburden) has been removed on the 16.1 acres and the valuable coarse sand has been exposed. In the past 7 years, the ratio of coarse sand to fine sand has substantially increased in favor of coarse sand. By 1969, virtually all sand being removed from the 16.1 acre pit was coarse sand.
The taking was made subject to the reservation (LSA-R.S. 9:5806) in perpetuity in favor of defendants reserving all oil, gas and other minerals and royalties therefrom located under the expropriated property. The taking was also subject to existing oil, gas or mineral reservations or existing oil, gas or mineral leases.
Landowners contend and we agree that the taking of surface rights effectively took their sand deposit reserved to them under LSA-R.S. 9:5806. Defendants owners lessors claimed fee interest compensation for 17 of the acres taken, their interest as lessors-owners in the 80 acres under lease (which was also taken), and severance damages to the remaining acreage which they own in fee. Defendant lessee claimed recognition of and compensation for its leasehold interest in the 80 acres subject to its lease.
Plaintiffs denied lessee's interest. As against owners lessors, plaintiffs maintain that the entire 219.8 acres had only water access and should be valued accordingly.
In appraising the property the trial court properly ruled that access by road was available to landowners and its lessee.
Plaintiffs argue that by virtue of a December 30, 1941 cash sale, landowners transferred certain land to the Lafayette Parish Police Jury thereby causing the remaining tract to become an enclaved estate. Plaintiffs maintain that by virtue of this voluntary act, landowners should be deprived of the benefits of LSA-C.C. Art. 699 and 700 and be denied the status of landowners entitled to demand access. See Estopinal v. Storck's Estate, 44 So.2d 704 (La.App.Orl.1950) and Arcuri v. Cali, 244 So.2d 309 (La.App. 4 Cir. 1971), where plaintiff landowner sold himself into an enclaved estate. Plaintiffs also argue that even though defendants have no land access, they could not demand such access for an additional reasonthey have water access along Bayou Tortue.
The trial court properly held that Bayou Tortue affords no useful access and therefore, landowners and their lessee are in need of access. We quote approvingly from La.Law Rev. 315 where it is noted that:
"Today, even a property with access to a watercourse could well be considered as `enclosed' with need for access to a public road."
This statement embodies the idea that the provisions of LSA-C.C. Art. 699 as amended in 1916 provided by implication that access to either a public road, railroad, tramroad or a watercourse was sufficient to deny landowner the right to passage on the estate of another was outdated. This may have been the reason for *465 the 1970 amendment to LSA-C.C. Art. 699 which, among other things, deleted reference to water access or watercourse. The purpose of the 1916 amendment was ". . . to allow construction of the proper facility needed in a particular case according to the circumstances and the exigencies of the case." Rockholt v. Keaty, 256 La. 629, 237 So.2d 663 (1970). The implication of these amendments is not only that the needs of the particular estate must be taken into account in determining whether the "access" available to it is indeed access sufficient to prevent the application of Art. 699, but also, that water access is insufficient per se to prevent application of Art. 699.
In the present case, the mining of sand requires that dump trucks have access to defendant's land and therefore, the accessibility of Bayou Tortue affords defendant no proper access ". . . according to the circumstances and exigencies of the case."
Secondly, according to the testimony of both plaintiff and defendant witnesses, Acadian was being permitted access to the Airport road at the time of expropriation. This access had originally been granted pursuant to a lease between Acadian and the Airport Authority. The lease called for payment of $150 per year for use of the road and it expired on August 18, 1969 5 months before the taking. The record shows that this use continued for some two months after the taking. However, this access existed at the whim of the Airport Authority and without further showing we find that the taken property had no land access at the time of expropriation.
The Estopinal case only stands for the proposition that a landowner who enclaves himself must proceed under LSA-C.C. Art. 699 and not 701. Defendants still had a right to acquire a right-of-way at the time of the taking.
There is some difficulty with the application of LSA-C.C. Art. 699 to an owner who has enclaved himself. English Realty Company v. Meyer, 228 La. 423, 82 So.2d 698 (1955) held that where a landowner who originally had access, saw fit to voluntarily sell parcels of his land so as to enclave himself, he could not proceed under Art. 699 or 701 to regain access. This case would seem to preclude defendants action under Art. 699 were it not for the holding that ". . . the English Realty case cannot extend beyond the holding applicable to its particular facts." Rockholt v. Keaty, 256 La. 629, 237 So.2d 663 at 667. The facts of the case were that plaintiff had acquired the original tract subsequent to the expropriation and that he had plenty of access to available roads before selling most of the property to private purchasers. This is not the case before us.
This record shows that the 1941 sale to the Police Jury was made so that the present airport could be constructed on land so transferred. In the absence of amicable settlement, the Police Jury could have proceeded under its authority to expropriate (LSA-R.S. 19:2) and taken the land for such purpose. Rockholt v. Keaty, supra, held that if an estate loses its access via expropriation it becomes an "enclaved" estate within the meaning of LSA-C.C. Art. 699 to obtain access. This rule is applicable in this case. These landowners did not require the public authority to resort to expropriation, but have not thereby been deprived of their right to acquire access under 699. Indeed the expropriating authority is required to attempt to purchase via negotiation. Defendants are not to be punished for their cooperation in this endeavor. The argument that landowner has been adequately compensated in that sale, for his loss of access, is refuted in the Rockholt case. Applicable here is the statement that:
". . . it would run contrary to public policy to encourage landlocking of such a valuable asset and forever removing it from commerce and from public as well as private benefit." 237 So. 2d 663 at 668.
*466 We find that at the time of expropriation, the taken land had the right to acquire access under LSA-C.C. Art. 699 via the airport road.[2] Compensation, of course, would have to be paid by defendant under Art. 699 for such access, but we believe that the Airport Authority, having leased such a right for $150 a year previously, has thereby set the amount of compensation it deems adequate. Since this amount is a nominal sum we find that it would have negligible adverse impact upon the market value of the taken land. Accordingly, the valuation of the taken land is virtually the same as if the land had access.
The water access is of no real value for access purposes but may have recreational value.
The trial court found that under LSA-C.C. Art. 2697, the lease terminated if the thing subject to the lease is taken for a public utility. It was held that the lessee had no leasehold interest in the property and lessee's claim was dismissed. We do not agree.
The general rule in Louisiana [State Through Department of Highways v. Sumrall, 167 So.2d 503, 509 (La.App. 1 Cir. 1964]; In re Morgan R. R. v. S. S. Co., 32 La.Ann. 371 (1880)] and elsewhere, [See 27 Am.Jur. Section 250, 29A C.J.S. Eminent Domain § 198, and Nichols, Vol. 4 § 12:42(1)] is that if the lessor and lessee have provided in the lease that the lease shall be cancelled in the event of condemnation or a change in zoning, then the court must follow this mandate and the lessee will have no compensable interest. However, if there is no such provision, then lessee's separate substantive right is subject to compensation.
The unrecorded lease agreement contained this provision:
"It is provided however, that if, after the discovery and production of said minerals in paying quantities the production thereof should cease from any cause, this assignment shall terminate unless assignee resumes or restores production or commences additional development operations within sixty days thereafter. . ." (Emphasis added.)
Since the clause phrases the discontinuance of production as "ceases" and provides for prevention of termination via a "restoration" of production (both phrases implying some transitory difficulty within lessee's control), the above clause does not contemplate the cessation of production because of condemnation of the property. The only clause dealing with "prevention" of production (under which category we would expect to find expropriation listed) addresses itself to strikes, accidents, action of the elements, war, etc., and makes no mention of expropriation.
LSA-C.C. Art. 2697 is designed in part to protect a lessee from the enforcement of the terms of the lease against him when the property has been taken from him. Planiol, Vol. 2, no. 1733 bears out this interpretation:
"The rent ceases to be due, when for whatever reason, the lessor cannot provide the lessee with the enjoyment of the thing. In other words, in the contract of lease, the risk is on the lessor."
The other general area of applicability of Art. 2697 was offered by Justice Sanders in his dissent to State Through Dept. of Highways v. Holmes, 253 La. 1099, 221 So. 2d 811, 816 (1969). "The lessee has no claim for damages against the lessor. LSA-C.C. Art. 2697." Neither interpretation supports the trial court's application of Art. 2697 and it was therefore inappropriate.
We find that Acadian did indeed have a leasehold interest. Whether or not lessee established that its leasehold interest had *467 a "leasehold advantage" and its value, if any, will be considered later.
The trial court improperly sustained plaintiff's objection to evidence of the quality and extent of the sand deposit and other physical attributes of the subject property (thickness of overburden, angle of stability of the sand deposit, etc.); evidence of the dollar amount of royalties paid under a sand mining lease, the volume of sand previously produced and the existence of a market for such sand; evidence of increased royalty payments; and evidence showing that neighboring properties sold for sand mining purposes were unable to produce comparable sand.
The general rule in Louisiana is that the measure of compensation to which the owner is entitled in an expropriation proceeding is the price which an equally informed willing buyer and seller would agree upon under usual and ordinary circumstances. State Through Dept. of Highways v. Barber, 238 La. 587, 115 So.2d 864 (1959); Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491 (1959). This price thus determined is nominated market value and ". . . means the worth of the land considered in the light of its best and highest use, this being the most favorable employment to which the property is adaptable and may reasonably be put in the not too distant future." State Through Dept. of Highways v. Rapier, 246 La. 150, 155, 164 So.2d 280, 282 (1964). The use must be one which affects the present market value of the land taken [Parish of Iberia v. Cook, supra], i. e. a use which would be considered by a willing buyer as affecting the market value. Parish of East Baton Rouge v. Ronaldson, 150 So.2d 356 (La. App. 1 Cir. 1963).
As a general proposition, it has been held by the Louisiana Supreme Court that any evidence which relevantly bears on market value may be admitted at trial. Shreveport v. Abe Meyer Corp., 219 La. 128, 52 So.2d 445 (1951). The trial court's refusal to allow evidence as to the value of the expropriated sand deposit requires the trier of facts to close his eyes to all evidence other than that the landowners had a sand deposit. Supposedly the quantity, quality, amount of overburden, the marketability and the income received by landowners for sand production would have no effect on the market value of this land. This is not supported by the law.
We acknowledge the rule that in determining the amount of compensation to be paid, courts must attempt to value land taken as a whole without separate valuation of its component parts. State Through Dept. of Highways v. D. H. Sanders Realty Co., 244 La. 934, 155 So.2d 24 (1964); State Through Dept. of Highways v. Hayward, 243 La. 1036, 150 So.2d 6 (1963). However, ". . . the single use which is most profitable usually will be used as a basis for computing market value if established as a use to which the property is adaptable and may reasonably be put in the not too distant future." Dakin and Klein, Eminent Domain in Louisiana, (1970), p. 170; Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491 (1959); State Through Dept. of Highways v. Ragusa, 234 La. 51, 99 So.2d 20 (1958). Therefore, in determining the highest and best use of a tract of land, it is necessary for courts to compare the various uses to which the land may be put. State v. Chadick, 226 La. 367, 76 So.2d 398 (1954). Logic dictates that this comparison could be fairly made only when each use is accurately gauged as to income potential. State Through Dept. of Highways v. Hedwig, Inc., 133 So.2d 180 (La.App. 4 Cir. 1961). And to this end, ". . . any evidence bearing on the potential use of the property is admissible, subject only to the general rules of evidence." Dakin & Klein, supra, p. 172; State Through Dept. of Highways v. Madden, 139 So.2d 21 (La. App. 2 Cir. 1962).
Applicable here is the rule quoted approvingly in State Through Dept. of Highways *468 v. Hayward, 243 La. 1036, 150 So.2d 6 (1963) at p. 10:
"`. . . It was proper to show the quantity and quality of the sand, and these elements could be considered in arriving at the value of the land as a whole . . .'"
See also, State Through Dept. of Highways v. Hart, 249 So.2d 310 (La.App. 1 Cir. 1971); State Through Sabine River Authority v. Miller, 184 So.2d 780 (La.App. 3 Cir. 1966); Nichols on Eminent Domain (Revised 3rd ed.) 1962, Vol. 4, Section 13.22 p. 408 et seq.; 29A C.J.S. Eminent Domain § 174, pp. 736, 737; Am.Jur.2d Vol. 27, section 290, pp. 91, 92.
The excluded evidence is properly before us in a proffer of proof.
It would be quite impossible to show that a tract of land was desirable for mining purposes without showing that some market existed for the product obtained therefrom. "Before the factor of the presence of minerals in the land may be considered, it has been held necessary to show a market, good or bad, large or small, for the minerals." 29A C.J.S. Eminent Domain § 174, pp. 736, 737. Furthermore, it would be difficult if not impossible to gauge the relative desirability of this use without a thorough examination of the type, distance, and demands of the particular market. Recognizing this, Louisiana courts have held that ". . . the potential market for an underlying mineral may be considered in determining the degree to which it enhances market value." State Through Dept. of Highways v. Hart, 249 So.2d 210, 316 (La. App. 1 Cir. 1971).
It has been recognized that factors which bear upon market value of land used for mining purposes, are the amount of overburden, Mills v. United States, 363 F.2d 78, 80 (Ct. of Appeals, 8th Cir. 1966), and the side slope angle of stability (indicating volume of removal sand by showing how nearly vertical mining can be carried on without caveinscommonly referred to, erroneously, as "angle of repose"). United States v. Whitehurst, 337 F.2d 765, 768 (Ct. of Appeals, 4th Cir. 1964).
Evidence pointing to the impact that overburden and the slope of stability have not only upon the value of land for mining purposes but upon its possible use for mining is found in this record in defendants' proffer which shows that W. L. Daly of Daly Sand & Gravel, Inc. was forced to abandon mining operations on a nearby tract acquired from Patrick Bonin because of overly thick overburden and frequent caveins. We find evidence relating to overburden and slope of stability admissible as "evidence relevantly bearing on market value."
Evidence showing the increased market value of the 16.1 acres where the overburden has been removed is admissible on the same premise. Both plaintiff's witness Ralph H. McGee (Tr. 16-17) and defendant's witness Charles R. Holloway (Proffer 2-3) stated that land with less overburden is more desirable. A sand pit without overburden is even more valuable. Holloway 2, 3.
Furthermore, topographical factors generally and those relating to improvements such as land clearing which affect market value have been generally held admissible in La. Central Louisiana Electric Co. v. Fontenot, 159 So.2d 738 (La.App. 3 Cir. 1964); La. Power & Light Co. v. de Bouchel, 143 So.2d 270 (La.App. 4 Cir. 1962). Therefore evidence showing the cost of removal of overburden is admissible as a factor affecting market value.
Evidence concerning royalty income is admissible. Landowners have been receiving more than $20,000 per year from 1963 through the date of taking. Their yearly income is more than ½ the total awarded for 97 acres plus severance damages suffered by the remainder of the tract. It is obvious that the trial court did not consider the royalties which were received *469 without expenditure of effort on the part of landowners. This evidence is also before us as a proffer of proof.
That the trial court erred in awarding less than two years income for the property is documented in the record, where, in response to the question of whether he would sell the tract for $40,000, plaintiff's appraiser J. Alfred Mouton answered "No." Tr. 40. The response supports our finding that a prospective purchaser would carefully consider the substantial yield from the property in arriving at a determination of the price he would pay for the property. It is no less certain that the owner would also consider this yield in determining the sale price. Such subjective considerations are the very crux of the notion of market value as determined by "an equally informed . . . willing buyer and seller". Applicable here is the rule that ". . . where such income is derived from the intrinsic nature of the property itself, and not from a business conducted on the property itself, the courts, as a general rule, accede to the view that income from property in the way of rents and profits is an element of consideration in arriving at the market value or measure of compensation to be paid." 27 Am.Jur., Section 286, p. 87. Another pertinent observation is that "Property of the money-income type is worth literally nothing save for its promise to yield to its owner a money intake. . ." J. Bonbright, Valuation of Property, 176, 230-231 (1937).
Louisiana courts have consistently held that rent or income is a material factor in the determination of fair market value and evidence bearing upon such income is admissible. Housing Authority of New Orleans v. Brinkmann, 224 La. 262, 69 So.2d 37 (1953); Housing Authority of New Orleans v. Persson, 203 La. 255, 13 So.2d 853 (1943); Louisiana Highway Commission v. Paciera, 205 La. 784, 18 So.2d 193 (1944).
Royalties may be properly characterized as rent. In King v. Harper, 33 La.Ann. 496 (1881), it was held:
"A mine or quarry, or land adapted to mining or quarrying, may be leased for a certain portion of the produce of such mine or quarry, and the fact that said portion is called `royalty' instead of rent, is not of the least consequence. For `rent (by whatever name called) is a certain profit in money, provisions, chattels or labor, issuing out of lands and tenements in retribution for the use.'"
And in Logan v. State Gravel Company, 158 La. 105, 103 So. 526 (1925) it was said that:
"the rent is always sufficiently certain if it can be readily ascertained."
See also Alvord v. Sun Oil Company, 251 So.2d 659 (La.App. 2 Cir. 1971) and Bouterie v. Kleinpeter, 258 La. 605, 247 So.2d 548, 553 (1971).
The erroneous ruling prohibiting evidence of the increased royalty payments was based upon the holding that the unrecorded agreement granting the increased royalty was inadmissible under the public records doctrine and could have no effect as to third parties, i. e. the plaintiffs. We do not agree.
Evidence concerning the unrecorded lease was admissible. The Louisiana Constitution of 1921, Art. 1, section 2 requires that "* * * just and adequate compensation (be) paid . . ." for the taking of private property for public purposes. Also relevant are LSA-C.C. Art. 497 and 2633 and LSA-R.S. 19:9. The common thread running through these constitutional, codal and statutory provisions is that actual fair market value must be determined by whatever relevant, competent evidence is available, and the landowner must be compensated in that amount. These provisions command a complete and accurate evaluation of the "true" fair market value of the property. To prevent the creation of a runaway "seller's market" the law has set forth certain circumstances under which the seller must sell and has circumscribed the limits of the price he may receive. *470 However, the law, (as set forth above) is meticulous and exacting in protecting the right of this "coerced seller" to receive full and fair compensation. To this end the jurisprudence has proclaimed that the seller and buyer must be considered "fully informed". State Through Dept. of Highways v. Hayward, 243 La. 1036, 150 So.2d 6, 8 (1963); State v. Burkes, 234 La. 659, 101 So.2d 193 (1958); State Through Dept. of Highways v. Mouledous, 200 So.2d 384 (La.App. 3 Cir. 1967). Therefore the purpose behind the registry rule, the protection of an ignorant good faith third party, has no application to the expropriating authority in the contest presently before us. To so apply it would facilitate the creation of an artificial and inaccurate valuation of taken property and defeat our constitutional requirements.
Plaintiffs are expropriating land and evidence which relevantly bears on market value may be admitted at trial. Shreveport v. Abe Meyer Corp., 219 La. 128, 52 So.2d 445 (1951). Having previously found evidence of royalties relevant and admissible, we also find the change in the rate of royalties relevant and admissible.
The trial court erred in preventing cross-examination of the expropriating authorities experts on questions tending to show that alleged comparable sand producing lands used by their experts were not remotely comparable to landowners' property.
Professor Dakin states and we agree, that "the scope of cross-examination has not yet been judicially established in a Louisiana expropriation case." Dakin & Klein, supra, p. 387. It is pointed out that the Louisiana rule in civil cases is that a witness may be cross examined on the whole case irrespective of the extent of direct examination. King v. Atkins, 33 La.Ann. 1057 (1881). The rule generally followed in other states in expropriation cases is set forth in 5 Nichols, section 18.45(2), p. 219, 223:
"The scope of cross-examination of experts and other witnesses who have testified to value in land damage cases is very broad, since cross-examination is often the only protection of the opposing party against the unwarranted estimates that a certain class of mercenary experts is want to indulge in."
* * * * * *
"When sales of comparable properties in the vicinity of the property involved have been testified to on direct examination, or are the basis of a witness' opinion as to value, cross-examination as to such sales is proper for the purpose of testing his knowledge of market values or lessening the weight of his opinion."
In light of Louisiana's relatively broad scope of cross-examination in civil cases generally, the above rule with respect to cross-examination as to comparable sales is the proper rule to be followed in Louisiana in expropriation cases.
Defendants properly preserved the excluded evidence by proffer under LSA-C.C.P. 1636. We will proceed to decide this case based in part upon the proffered evidence which we have found to be admissible. Broussard v. State Farm Mutual Automobile Insurance Company, 188 So.2d 111, 114 (La.App. 3 Cir. 1966).

THE AWARDEVIDENCE
We turn now to summarize our findings from the testimony and statements of the non-appraisers for both plaintiffs and defendants. Plaintiffs' non-appraiser witness civil engineer Ralph D. McGee, Jr., was unable to compare the sand on defendants' property and that of the surrounding tracts which he studied.
From the testimony and statements of defendants' nonappraiser witnesses, Charles R. Holloway, Ralph L. Davenport, Thomas *471 S. Broyles, James R. Gilbert and W. L. Daly, we find that the quality of sand on defendants' land was unique in the area within 75 miles of Lafayette and the expropriated sand mine enjoyed a virtual monopoly on the marketa situation unparalleled elsewhere in Louisiana. The side slope angle of stability in defendants' pit was 1 to 1 above water and 1 to 1.5 below water. With equipment presently owned by Acadian, the pit and the surrounding sand deposit, could be mined safely to a depth of 100 feet. Therefore there is approximately 3,361,847 cubic yards of recoverable sand on defendants' land.
After a depth of 35' (10' of overburden and 25' of fine sand) is reached, the sand mined is 80% coarse sand and 20% fine sand. Therefore, the recoverable deposit of 3,361,847 cubic yards does not consist entirely of coarse sand and since Acadian is no longer the only producer of fine sand in the area, it has no competitive advantage on the value of fine sand.
The overburden on defendants' land is only 10 feet which is substantially less overburden than was found on the alleged comparables. In order to mine the land under the overburden, 1) the land has to be cleared and 2) the overburden removed. The cost of clearing the land is $500 an acre and the cost of removing overburden is 29 cents per cubic yard. Approximately 260,000 cubic yards of overburden were removed by Acadian in creating the existing 16.1 acre mining pit which was being mined at the 40' depth at the taking.
Holloway's valuation of Acadian's leasehold advantage is impressive because of his experience as sales manager for five sand and gravel companies and his ownership of another. City of Shreveport v. Abe Meyer Corp., 219 La. 128, 52 So.2d 445 (1951). He had no interest in the subject tract, but has had extensive experience in evaluating and purchasing sand mining properties all over Louisiana. He valued the leasehold advantage for Acadian at between $100,000 and $350,000, based partly on the fact that he knew of no other pit in Louisiana which enjoyed such a competitive advantage for material of this type. Royalties of 35 cents per cubic yard were common for this type material and Acadian's contract called for only 22 cents per cubic yard. Holloway reviewed the past markets and projected the future market for this product. The bases for his evaluations seem accurate and well founded.
Plaintiffs' appraisers were Mr. Preston Babineaux and Mr. J. Alfred Mouton. Babineaux has been in the appraisal business 12 years but this was his first appraisal of land on which a mining operation was in progress. Mouton has been in the real estate business for 33 years in Lafayette and has appraised property as part of that business. His son (a business partner) is a member of the expropriating authority, the Lafayette Parish Police Jury. Mouton admitted that he knew nothing about the market for mining properties and that he had no experience in valuing sand or mining properties. These appraisers worked together and submitted one report. Mouton's testimony was stipulated to be "substantially the same" as Babineaux's testimony.
These appraisers were advised by counsel that the cubic yard royalty paid was for value in a business and not part of a rent. Tr. 114. They understood that the economic rent received by landowners was $4.80 per acre per year, based on the recorded lease which provided for a minimum $1,000 per year lease for 219.8 acres.
The trial court accepted and summarized their appraisal in his written reasons. Tr. 169, 170.

"VALUE OF WHOLE PROPERTY BEFORE
TAKING
114.3 acresrecreational × $330 = $37,719.00
16.1 acresborrow pit cavity × $400 = 6,440.00
27 acressand deposit × $550 = 14,850.00
62.4 acresrecreational × $330 = 20,592.00
____
219.80 acres Value of Whole Property __________
 before taking $79,601.00

*472
VALUE OF PART TAKEN AS PART OF
 WHOLE PROPERTY AS THAT PART
RELATES TO THE WHOLE
Acres taken: 96.963 acres
Classification of acres taken:
 17.2 acres sand deposit @ $550
 per acre = $ 9,460.00
 16.1 acres borrow pit cavity @ $400
 per acre = 6,440.00
 63.663 acres recreational @ $330
 per acre = 21,008.79
 __________
 96.963 acres taken
Total value of part taken as it relates to
the whole $36,908.79
VALUE OF REMAINDER BEFORE TAKING
AS PART OF WHOLE PROPERTY
Value of whole property $79,601.00
Less:
 Value of part taken as part of whole
 property 36,908.79
 __________
Value of remainder before taking $42,692.21
 __________
VALUE OF REMAINING PROPERTY
 AFTER THE TAKING AS A SEPARATE
 ENTITY (REMAINING ACREAGE AFTER
TAKING 122.837 ACRES)
Classification of acres remaining:
 9 acres undisturbed sand deposit
 @ $550 $ 4,950.00
 .8 acres (change of highest and best
 use) @ $150 120.00
103.037 acres recreational land undisturbed
 @ $330 34,002.21
 9.90 acres recreational land disturbed
 and isolated @ $150 1,485.00
 __________
Total value after taking of remaining
122.837 acres $40,557.21
MEASUREMENT OF SEVERANCE DAMAGES
Value of the remainder before taking as
part of the whole property 122.837
acres $42,692.21
Value of remaining 122.837 acres after
taking as a separate entity 40,557.21
 __________
Severance damages $ 2,135.00

Therefore the just and adequate compensation and severance damages as found by plaintiffs' appraisers is as follows:

Just and adequate compensation $36,908.79
Severance damages 2,135.00"

These appraisers erred in concluding that Daly purchased a half interest in certain property (from Knight) when in fact Daly purchased a one-fourth interest. Other errors appear in their report, but their failure to consider 1) the quantity and quality of the sand deposits on the comparable and the taken tracts, 2) the relative problems relating to removal of overburden and 3) the market advantage enjoyed by defendants' sand mine, renders their appraisal unacceptable.
The opinion of each witness qualified and accepted as an expert is given effect if and when it appears to be well grounded from the standpoints of sincerity and good reasoning. Housing Authority of New Orleans v. Boudwine, 224 La. 988, 993, 71 So.2d 541, 543 (1954). If it is not so grounded, it will be disregarded. State Through Dept. of Highways v. D. H. Sanders Realty Co., 244 La. 934, 155 So.2d 24 (1963); State Through Dept. of Highways v. Barber, 238 La. 587, 115 So.2d 864 (1959). Among the factors which mitigate against the acceptance of a witnesses' testimony is his unfamiliarity with the type of property expropriated [Central La. Electric Co. v. Covington & St. Tammany L. & I. Co., 131 So.2d 369 (La.App. 1 Cir. 1961); State Through Dept. of Highways v. Milam, 130 So.2d 145 (La.App. 2 Cir. 1961)], lack of thoroughness of the appraisal [State Through Dept. of Highways v. Williams, 170 So.2d 152 (La.App. 2 Cir. 1964)], as well as clarity and organization [State Through Dept. of Highways v. American Credit Exchange, Inc., 161 So.2d 397 (La. App. 1 Cir. 1964)], lack of consideration of elements of value considered controlling by the courts [City of Natchitoches v. Cox, 135 So.2d 302 (La.App. 3 Cir. 1961)], and unsoundness of the reasons given in support of the estimate [State, Through Dept. of Highways v. Barber, 238 La. 587, 115 So. 2d 864 (1959)]. Plaintiffs' appraisers have failed on all counts. The best summary on the issue of sincerity is the negative reply by Mouton when asked if he would sell the expropriated property for $40,000.
Defendants' expert appraisers were not allowed to testify concerning the quantity and quality of the sand deposit on defendants' tract as compared to alleged comparable tracts. Their reports are in evidence as proffers of proof. Mr. Allen J. *473 Angers is a real estate appraiser possessing an unusually high degree of competence. Defendants' other appraiser Mr. Maurice J. Chappuis is also a highly experienced and qualified appraiser.
Angers concluded that the market data approach and capitalization of income established that $194,349.00 should be awarded landowners for the taken tract together with severance damages. Chappuis appraisal based on the market data approach and capitalization of income established a value of $155,000.00 for the taken tract together with severance damages.
We find errors in the calculations and assumptions in both the Angers and Chappuis reports. The report of defendants' expert Mr. George Parker is too vague in the area of valuation and comparable sales. Defendants' last appraiser Mr. T. M. Wilkes made substantial erroneous assumptions in concluding that $384,000.00 would be a proper award to defendants.

APPORTIONMENT OF AWARD
We next consider the apportionment of the award between lessor and lessee bearing in mind the admonition that:
"Since it is the property itself which is to be evaluated, and not the separate interests therein, the appraisal should generally be made for the property as a whole, without regard to various diverse interests which may exist; that is to say, the property should be appraised as if in a single ownership." S. McMichael's
Appraising Manual, p. 459 (4 ed. 1951). It is equally important to consider that
". . . where land subject to lease is taken, two separate sets of rights are acquired by the expropriator, those of the landowner and those of the lessee. Thus the expropriator cannot focus narrowly on the value of Landowner interest, and expect the lessee to derive his recompense from that award, or vice versa." State of Louisiana Through Sabine River Authority v. Carter, 293 F. Supp. 1171 (W.D.La.1968). See also State Through Dept. of Highways v. Holmes, 253 La. 1099, 221 So.2d 811, 814 (1969).
The leading Louisiana case in the area of valuation of lessor-owner and lessee's interest is In re Morgan R. R. & S. S. Co., 32 La.Ann. 371 (1880). Landowners' rights were held to be a composite of two things: 1) the full ownership of the thing encumbered by the lease, and 2) the monthly rents during the term of the lease. As to lessee's interest, they held at page 375 that:
"If that right is worth no more than the lessee has agreed to pay for it, then, as the price, or rent in future, is yet to be paid, and as the company, holding the owner's rights, is the payee thereof, the company would owe the lessee nothing. But if the right is worth more than the sum so agreed to be paid for it, the lessee is certainly entitled to be paid the amount of this excess. He must have the value of the right which is taken away from him."
* * * * * *
"The true question is, what advantage could the lessee get for the lease over the price or rent they are to pay? In other words, if the lease was put on the market for sale, what sum in excess of sixty dollars per month (contract rent in this case) could be obtained for it, the improvements put thereon by the present lessees being excluded from the calculation." (Parenthetical additions by writer.) At page 377.
In State Through Department of Highways v. Cockerham, 182 So.2d 786 (La.App. 1 Cir. 1965), writs refused 249 La. 110, 185 So.2d 219 (1966), lessee was awarded the present value of the lease advantage. There is an excellent summary of the law relating to apportionment of awards between lessor and lessee (without reference to a particular formulae, i. e. capitalization or market data, etc.) found in Cockerham (182 So.2d 786) at page 791.

*474 THE AWARDAPPLICABLE LAW
Louisiana courts maintain a strong preference for the use of "comparable sales" in ascertaining market value. Dakin & Klein, supra, p. 181. As Professor Dakin points out "The appraiser's technique in using the comparables method is to select the most comparable sales of the most comparable properties and then to gain additional accuracy in comparison through the employment of adjustments to the price of the comparable." p. 181. These adjustments most frequently revolve around differences in time and circumstances of the sale, proximity and size of the parcels, and physical characteristics of the land.
Although there is substantial jurisprudential attachment to the concept of valuation based on comparable sales, ". . where the record contains no satisfactory evidence of sales comparable to that involved, ascertainment of the true value must be sought by a consideration of other factors and circumstances . . ." Rapides Parish School Board v. Nassif, 232 La. 218, 225, 94 So.2d 40, 42 (1957). See also State Through Dept. of Highways v. McDuffie, 240 La. 378, 123 So.2d 93 (1960).
Not infrequently, the sales found in the investigation are not helpful because of differences of time, location, or size of the land sold, or quality of the material, or mineable depth or zoning or other factors. Where mines are involved, fewer sales data of a comparable nature are available and market data is usually inapplicable. Owing to this condition, it usually becomes necessary to use other data (the royalty income) either as a check or for the purpose of arriving at a conclusion of value. See George L. Schmity "Condemnation Appraisal Handbook", Prentice-Hall, Inc. 1963.
In studying the appraisal reports, one becomes aware of the fact that of the multitude of variables involved in the comparative valuation of any two given tracts of sand mining land, only a handful are present in each report. Although some of the reports reach fairly similar approximations of value, their calculations were based on differently composed handfuls of factors. This helter skelter grasping of variables in an effort to properly adjust the "comparable" sales indicates to us the one basic flaw in the search for comparablesthere are no comparable sales to relate to this taking.
Some of the variables involved in the comparisons of tracts of sand land are size of the deposit, depth of overburden, types of sand and their respective proportions of volume, slope of angle of repose, and market advantage. Cases in Louisiana have found lack of comparability on such relatively insignificant variables as shape and depth of a piece of property [State Through Department of Highways v. Cockerham, 182 So.2d 786 (La.App. 1 Cir. 1965)], and size [State Through Department of Highways v. Henry, 192 So.2d 801 (La.App. 1 Cir. 1966); State Through Dept. of Highways v. Bourgeois, 146 So.2d 642 (La.App. 1 Cir. 1962)]. It was observed in State Through Dept. of Highways v. McDuffie that where the adjustment of "comparable" involves too much speculation then the "comparables" are rendered unreliable. When such a situation is confronted, ". . . ascertainment of the true value must be sought by a consideration of other factors and circumstances, . . . Among such other factors is the rental-income approach method . . ." State Through Dept. of Highways v. Gras, 131 So.2d 628 (La.App. 2 Cir. 1961).
The Louisiana Supreme Court has, on occasion, seen fit to use capitalization of rentals as the method of valuation of taken property. State v. Tramuta, 234 La. 741, 101 So.2d 450 (1958); State Through Dept. of Highways v. McDuffie, 240 La. 378, 123 So.2d 93, and after an extensive review of Supreme Court decisions, Professor Dakin concludes that
". . . it . . . appears that the method will be approved whenever market data on comparables are lacking or when a sufficiently strong case appears *475 for the use of income as a measure of value as, for example, in the case of commercial rental properties leaving relatively unique improvements with which to draw comparisons." p. 218 (Emphasis added.)
We note again that the sand deposit in this case is unique.
In other jurisdictions it is ". . . generally conceded that with respect to properties owned for income purposes the capitalization of income is the preferable method for calculating value, if the consideration is given to the other pertinent factors." 27 Am.Jur.2d, § 286, p. 87.
A complete explanation of the "Capitalized-income method" of valuation is found in Professor Dakin's work, supra, pp. 211-239 but a short definition taken from J. Bombright, Valuation of Property 176, 230-231 (1937) is that "In its more usual form, it involves a capitalization or discounted valuation of the realized or prospective net monetary income derivable by continuous exploitation rather than by resale."
As Dakin points out (p. 272): "The worth of such lease advantage would hence be the present value of an annuity consisting of such rent difference at whatever interest rate is deemed appropriate in light of the risks involved as to payment." A similar discounting formula would have to be applied to lessor's lease interest.
Since there are no comparable sales, the above authorities direct us to arrive at an award by way of the income capitalization approach. As noted earlier, we consider the entire mineral interest subject to expropriation to be 100% taken irrespective of the reservation thereof to defendants. State Through Sabine River Authority v. Salter, 184 So.2d 783 (La.App. 3 Cir. 1966) points up the fact that peculiarities in a mineral deposit and the resultant peculiar necessities for extraction can be such that an expropriation which would leave an ordinary deposit recoverable, will work a total taking on the peculiar deposit. Due to the fact that sand mining necessitates the creation of large pits and dredging operations thereon, and the fact that the airport expropriated this land for runways across the surface of the land, we find that the nature of the expropriation prevents future extraction of sand both from the taken land and from the 0.8 acre sand deposit on the land not taken.
On the expert testimony of Mr. James R. Gilbert we conclude that the sand deposit could be mined to a level of 100 feet below the surface of the land. With overburden of 10 feet this gives a depth of 90 feet of sand. On 16.1 acres of land approximately 40 feet of sand have been removed so that this area is 44% depleted. There are 1613 cubic yards per acre foot in a sand mine. Thus with 50' of mineable sand in the 16.1 acre tract and 90' of mineable sand in the 18 acres, the total recoverable sand is 3,311,525 cubic yards.
The experts were persuasive in concluding that the average annual production for the last seven years is likely to continue. At the rate of 93,982 cubic yards per annum (the seven year average), it would take 35 years to produce the recoverable sand.
Because of the side slope angle of stability, the allowance for shallower production than projected, the allowance for less than 100% efficiency, the possibility of clay pockets, the possibility of competition with other sand or even the elimination of the market for such sand by other materials, we reduce the potential life span from 35 years to 20 years.
Based on this projection, we must determine the capitalization rate. Chappuis used a factor of 7.469 while Angers used 8.8124. We use a factor of 8.000.
Now the most crucial question is whether there will be a computation on the basis of contract rent or whether we have found a different economic rent. It will be recalled that a witness may be considered an expert in valuing land for a specific use if he is familiar with land so *476 adapted. City of Shreveport v. Abe Meyer Corp., 219 La. 128, 52 So.2d 445 (1951). Furthermore, it has been held that when there are no comparables available, the testimony of persons who have dealt extensively with sales and purchases of lands in the area may be received as expert opinions to establish value. State Through Department of Highways v. Gielen, 184 So.2d 737 (La. App. 3 Cir. 1966). Therefore, we believe that Mr. Holloway is an expert in the field of valuation of said mine leases. We accept his testimony that 35 cents per cubic yard is a fair rental for this sand. This gives Acadian Development a lease advantage of 13 cents per cubic yard.
We allow for earnings of $30,000 per year (93,982 cubic yards per year times 35 cents = $32,893.70 rounded to $30,000 for market fluctuations). Projecting a 20 year income we arrive at a discount factor of 8.000 which is used to multiply the $30,000 annual income. Thus the total value of the sand pits as of January 30, 1970 is $240,000. Defendant landowners are entitled to 22/35 or $151,000 and defendant lessee is entitled to 13/35 or $89,000 as their respective interests in 34.1 acres of expropriated property.
Plaintiff took 97 acres and total severance damages are awarded for the isolated 10.7 acre tract making a total of 107.7 acres for which compensation is due. The $151,000 award to landowners is for their interest in the 34.1 acre sand mining property, all of which is under lease. This leaves the following lands to be valued:
 RECREATIONAL
45.9 acres (subject to Acadian's lease).
 9.9 acres (as severancenot under lease).
17. acres (takennot under lease).
 COARSE SAND LAND
 0.8 acre (as severancenot under lease).
Mr. Chappuis offers an excellent selection and review of five comparable sales of recreational properties. After adjustments for time, size, desirability, drainage, topography and relation to Lafayette, he valued landowners' recreational land at $375 per acre. We accept this figure.
The 9.9 acres and 17 acres of unleased recreational property is valued at $10,087.50.
Although the .8 acre of coarse sand land is not under lease, it was being mined up to the date of the taking. Exhibit I. It is therefore proper to award landowners the value of this tract as a component of the 34.1 acre sand deposit adjacent thereto rather than as a separate small unmineable tract. Nevertheless, we will not award the full $5,600 value since the tract is not under lease. An award of $2,000 appears appropriate under the circumstances.
Two of landowners' experts appraised landowners' reversionary interest in the 80 acres subject to Acadian's lease. The third appraiser assigned no value to this reversionary interest on the basis that it was too speculative. We accept the latter conclusion for the reason that the lease for sand development may extend for an undeterminable period. We accept Mr. Chappuis's conclusion that under these circumstances, investor's would not be interested in purchasing this interest.
We acknowledge that some of the cubic yardage deemed recoverable included some fine sand. However our computation is nonetheless valid because we have given the expropriating authorities every possible benefit in rounding off the computations.
The trial court judgment as to defendants landowners is amended to increase the award to defendants J. Maxime Roy et al. to the sum of $163,087.50, together with legal interest from the date of the taking. The judgment as to defendant lessee Acadian Development Corporation is reversed.
It is ordered, adjudged and decreed that Acadian Development Corporation have judgment against plaintiffs Lafayette Airport Commission and the Lafayette Parish *477 Police Jury in the sum of $89,000, together with legal interest from the date of the taking.
The trial court assessed all court costs to plaintiffs and since no error has been assigned, we affirm that portion of the award. Costs of court on appeal are assessed to plaintiffs, but they are relieved from paying all except stenographers' costs for taking testimony. LSA-R.S. 13:4521.
Amended and affirmed in part; in part, reversed and rendered.
HOOD, J., dissents and assigns written reasons.
HOOD, Judge (dissenting).
My colleagues have held, and I agree, that evidence as to the quantity and quality of sand which underlies the property affected by this expropriation may be considered in determining the market value of that property. They also acknowledge that "courts must attempt to value land taken as a whole without separate valuation of its component parts."
After acknowledging these principles of law, the majority then proceeded to disregard or to misapply them, and instead, to use a method for determining market value and severance damages which I think is in direct conflict with those principles and with the settled jurisprudence of this state. I cannot agree with the ultimate conclusions which they have reached.
My colleagues have rejected the opinions expressed by all of the real estate experts who testified as to the market value of the property being taken. Instead of determining the market value of that property, the majority first estimated the total number of cubic yards of recoverable sand which underlies defendants' land. They then determined the current value per cubic yard of that sand to the landowner, and thereafter, by mathematical computations, they concluded that all of the sand which underlies the property has a present value to the defendants of $240,000.00. This value is predicated on the fact, of course, that the sand would have been mined diligently and efficiently for the next 20 years, that their estimate as to quantity is correct, that the market for the sand would have continued to hold up and that all of the recoverable sand would have been removed within that time.
The majority then held that defendants are entitled to recover the full sum of $240,000.00, representing the value of all of the recoverable sand underlying the property, even though plaintiffs can never mine or use that sand. They also held that defendants are entitled to the additional sum of $12,087.50 as the value of other property taken and severance damages. Judgment thus was rendered condemning plaintiffs to pay to defendants the total sum of $252,087.50.
I cannot agree with the conclusions reached by the majority as to the awards which should be made, or as to the methods used by them in arriving at the amounts of those awards.
In my opinion evidence as to the value of sand underlying the surface of a tract of land is admissible for the purpose of establishing the market value of that land. The value of that sand, however, is not the measure of just compensation. It is not proper to arrive at a value of the land being condemned by taking the quantity of sand which underlies that property and multiplying it either by a royalty rate per cubic yard, or by multiplying such quantity by the price sand is currently bringing per cubic yard. State through Department of Highways v. Hart, 249 So.2d 310 (La.App. 1 Cir. 1971); State, Through Department of Highways v. Hayward, 243 La. 1036, 150 So.2d 6 (1963); State, Through Department of Highways v. D. H. Sanders Realty Company, 244 La. 934, 155 So.2d 24 (1963); State, Department of Highways v. Acme Brick Company, 162 So.2d 37 (La.App. 1 Cir. 1964); Reiter v. State Highway Commission, 177 Kan. 683, 281 *478 P.2d 1080 (1955); Orgel, Valuation Under Eminent Domain, Vol. 1, Sec. 165, P. 671 (1953); 4 Nichols on Eminent Domain, Sec. 13.22 (1971); State Through Department of Highways v. Busch, 188 So.2d 495 (La.App. 3 Cir. 1966).
The issues presented in State, Through Department of Highways v. Hayward, supra, are almost identical to those presented here. In that case our Supreme Court refused to base its award on the value of the sand deposits on the affected property. In so holding the court said:
"And the loss to the owner must invariably be based on the market value of the land notwithstanding the fact that the land expropriated contains mineral deposits or other valuable materials."
"Clearly, then, although evidence of the value of materials or deposits on the land expropriated is admissible, such evidence may be received only for the purpose of establishing market value; it may not be employed as the yardstick of just compensation." (Emphasis added)
In the Hayward case the Supreme Court quoted with approval the following language which was used by the Supreme Court of Kansas in Reiter v. State Highway Commission, supra:
". . . . The question for determination was the value of the land, not the value of the sand beneath the surface. It was proper to show the quantity and quality of the sand, and these elements could be considered in arriving at the value of the land as a whole. However, it was not proper to arrive at the value of the land being condemned by taking such quantity of sand and multiplying it either by a royalty rate per yard, or by multiplying such quantity by a price sand was currently bringing per yard." (Emphasis added)
The majority in the instant case has taken an excerpt from the above quoted portion of the opinion of the Kansas court and has interpreted that excerpt as supporting its ultimate conclusion that defendants are entitled to recover the value of all of the sand on their property, computed on a cubic yard basis. The excerpt quoted by the majority, however, was taken out of context, and I think the interpretation which they placed on it is in direct conflict with what the court actually held.
In State, Through Department of Highways v. Hart, supra, the land being taken contained sand and gravel deposits, and the landowner contended that he should be compensated on the basis of the value per cubic yard of these deposits. The First Circuit Court of Appeal, in rejecting that argument, stated:
"Our jurisprudence is settled to the effect that evidence of the value of minerals or other underlying land deposits is admissible for the purpose of establishing market value in an expropriation proceeding, but that such evidence is not the measure of just compensation. . . ."

"The foregoing authorities completely negate the contention that the state must pay for land by the cubic yard where it has underlying minerals capable of being mined and sold at such unit price. The cited authorities compel our rejection of the testimony of Messrs. Andersons and McClendon who valued subject property on the basis of royalties that an owner could receive for mineral excavation therefrom . . . ." (Emphasis added)
In State, Through Department of Highways v. Busch, supra, the court stated:
"However, the court is of the opinion that the value of the minerals in the land expropriated can be taken into consideration only in arriving at the market value of the surface of the property taken, and as all of the testimony of Mr. Bates was based upon the value of the clay through the process of mining, the court cannot conceivably find that the potential *479 value as a clay mining operation, connected with the brick factory, is the determining factor in establishing the market value of the expropriated property." (Emphasis added)
These and other authorities indicate to me that the majority has erred in condemning plaintiffs in this case to pay to defendants the value of all of the sand, computed per cubic yard, which might be mined from the subject property.
The record contains the testimony or reports of six real estate appraisers, two of whom were called by plaintiffs, two by the landowners, and two by Acadian Development Corporation, the lessee. The majority has rejected the testimony of all of these experts as to the market value of the property affected by this expropriation, except that it accepted the opinion expressed by one of the landowners' experts, Maurice J. Chappuis, as to the value of that part of the property taken which has no sand deposits.
The opinions of the two real estate experts called by plaintiffs, Preston Babineaux and J. Alfred Mouton, were rejected because those experts supposedly did not give adequate consideration to the sand deposits on the land. While I feel that their appraisals were low, I do not agree that they failed to consider the sand deposits. Both of them, in fact, concluded that the property was best suited for sand mining purposes. The trial judge accepted their appraisals, and the majority has shown in its opinion that separate appraisals were made of the sand-bearing land as distinguished from the rest of the affected property.
The testimony of Acadian's appraisers, George Parker and T. M. Wilkes, was not accepted by the majority because Parker was "too vague" and Wilkes based his opinions on "substantial erroneous assumptions." I agree that the testimony of these witnesses should not be considered.
I feel, however, that the opinions as to market value expressed by the defendant landowners' appraisers, Allen J. Angers and Maurice J. Chappuis, should have been considered and given great weight by the majority. The majority recognized that Angers possessed "an unusually high degree of competence," and that Chappuis is a "highly experienced and qualified appraiser." Both of these experts went into great detail as to the quantity and quality of the sand deposits on this property, the cost of clearing the land and removing the overburden, the income which had been derived from sand mining operations, and the income which might be expected. After considering all of these matters, they concluded that the market value of the property being taken and all severance damages amounted to substantially less than the majority has awarded defendants. The defendant landowners offered the testimony of these two experts, and their principal arguments on this appeal are that the opinions expressed by these two appraisers should be accepted.
Angers and Chappuis used the market data and the income approach in arriving at conclusions as to value. Both found a substantial number of comparable sales affecting land having sand deposits in that area, some of these sales being to sand mining operators, and both had full information as to the amount of sand which had been produced and the royalties which had been paid to the landowners.
Angers appraised the property and severance damages at the aggregate sum of $226,818.00. It is apparent from his report, however, that he erred in his calculations. After determining the value per acre of the land having sand deposits, he multiplied that figure by 80, that being the number of acres which were under lease. Actually, only 34.1 acres contained and deposits. His appraisal thus must be considered to be substantially less than the above mentioned figure.
*480 Chappuis concluded that the property being taken had the following values:

16.1 acres containing sand deposits,
 excavated to 40 feet @ $7,405.00 $119,220.00
17.2 acres containing sand deposits,
 but not excavated @ $600.00 10,320.00
63.63 acres of land containing no sand
 deposits @ $375.00 23,875.00
 ___________
 Total $153,415.00

In addition to the above he found that defendants suffered severance damages amounting to $1,585.00, making the total market value of all property taken, plus severance damages, amount to the sum of $155,000.00.
I think the appraisal made by Chappuis is based on sound reasoning and good authorities. It is most favorable to defendants. All of the other evidence supports his conclusions, and I would accept his testimony as showing the true market value of the property being taken and severance damages. I will not discuss the question of whether Acadian has a lease advantage and, if so, how the total award for the property taken should be apportioned, because I feel that no useful purpose would be served by such a discussion here.
The majority states in one part of the opinion that "Since there are no comparable sales," they "arrive at an award by way of the income capitalization approach." This statement carries with it an inference that the majority was seeking to determine the market value of the property rather than the value per cubic yard of the sand deposits. I think there were several comparable sales, and that the majority opinion as a whole shows that my colleagues did not consider or attempt to determine the market value of the property being taken.
All six of the real estate appraisers whose testimony or reports are in the record cited and discussed in detail several comparable sales. All of these appraisers apparently felt that the comparable sales they found gave an accurate indication of the value of the property being taken here, and all of them based their appraisals largely on those comparable sales. In the face of this evidence, I do not understand how the majority can hold that there are no comparable sales.
A reading of the majority opinion indicates to me that my colleagues did not consider what a prospective purchaser would pay for the property being taken. They made no attempt to determine the highest price the property would bring if it were exposed for sale on the open market. They simply estimated the size of the sand deposit on the land and they awarded defendants the highest price they felt was currently being paid per cubic yard for that sand. Even if the majority's figures are correct as to the quantity and current price of sand (and I feel that they are not), I think it is unrealistic to assume that a prospective purchaser would pay a price for the property which amounts to the exact sum which he might expect to get back in the next 20 years, provided that the market for and price of sand holds up and that everything works out most favorably to him.
My principal objection to the judgment rendered by the majority is that it does not pretend to award defendants the actual market value of the property taken, as required by law. Instead, it awards them the current price per cubic yard of all of the recoverable sand underlying that property. I feel that such an award is contrary to our law and established jurisprudence. If the opinion is allowed to stand, it could serve as a precedent for requiring expropriating authorities hereafter to pay the current price per cubic yard or other appropriate unit for all top soil, gravel, clay, fill dirt, sand, salt, sulphur, oil and other minerals or substances which may be shown to be under or on the property, whether those substances had been mined from or were even known to exist on the property prior to the time the expropriation suit was filed. I do not think such a holding is in keeping with our established jurisprudence. I agree that evidence as to the quantity and quality of mineral deposits should be *481 received and considered, but I feel that the court should determine the actual market value of the property being taken, and that the award for the taking should be based on that finding.
If it should be determined ultimately that the method used by the majority in determining the amount of the award is correct, then I suggest that my colleagues have erred in several of their factual conclusions and in their computations.
In the latter part of the opinion, the majority concludes that there are 3,311,525 cubic yards of recoverable sand on the property. (In another part of that opinion they arrived at a different figure). They reason that there are 1613 cubic yards per acre foot, that there are 50 feet of mineable sand in the 16.1 acre tract and that there are 90 feet of mineable sand in the 18 acre tract. They multiplied 1613 times 50, and they multiplied that result by 16.1 to determine the number of cubic yards in the smaller tract. They then used the same mathematical formula to determine the quantity of sand in the 18 acre tract, and they added the two totals together to get the quantity of sand underlying the entire 34.1 acres. (Actually, there is an error in their computations, but that is immaterial). In using that procedure, they have incorrectly assumed that the walls of soil which surround or enclose these sand deposits are vertical, and that there is no side slope angle. All of the experts testified that that is not true, and that there is a decided angle of slope. Some of them point out that such a slope is necessary if the sand is to be mined at all, because otherwise there would be caveins. It seems to me that the majority is clearly wrong in these computations as to the quantity of sand which underlies this property, and that it would be more accurate to accept the estimate made by R. Douglas McGee, Jr., a registered professional engineer, that "the amount of material (sand) remaining to be dredged is approximately 1,300,000 cubic yards, excluding the overburden."
The majority points out that the "average annual yield from the property for the seven years prior to this taking was $20,824." They attach much significance to that figure, and they assume that the landowners would have continued to receive royalties at that annual rate for at least the next 20 years. I think they have been somewhat misled by arbitrarily selecting that particular seven year period (1963 to 1969, inclusive) for determining this average. Sand mining operations have been conducted on this property for 13 years, from 1957 to and including 1969. The average annual royalties for that 13 year period amount to $12,811.00. The royalties for the year 1962, the year before my colleagues began computing the average, were only $971.50. And, the royalties for the two year period immediately prior thereto, 1960 and 1961, were $1,006.64 and $1,697.55, respectively. It is apparent, therefore, that if the majority had arbitrarily selected an eight or ten year period, instead of seven years, the average annual royalties would have been much less.
This suit was filed in 1966, but defendants continued to mine sand while the suit was pending, up to January, 1970. More than twice as much was paid in royalties during the year 1967, the year after this suit was filed, than had ever been paid in any other previous year, and more royalties were paid in each of the last two years, 1968 and 1969, than had ever been paid before this suit was instituted. It is apparent that defendant stepped up their mining operations tremendously after the suit was filed, and that they were endeavoring to remove as much sand as possible before the property was taken. There, of course, was nothing wrong or improper about that, but I question whether the royalties which were paid after the expropriation suit was filed should be considered in determining the average annual royalty payments which the landowners could expect in the future. The average annual royalties which were paid from the time mining operations began until this suit was filed amount to $8,236.57 *482 per year. It seems to me that this would be a more realistic figure to use than that selected by the majority in computing the amount of royalties which the landowners might have expected to receive in future years had the property not been taken.
The evidence shows that 40 feet of sand have been removed from the 16.1 acre tract. Since there was a ten foot overburden, this means that the excavation was already 50 feet deep when the case was tried. The majority assumes that Acadian could have and would have continued to mine sand from that area down to 100 feet with no additional expensethat is with no decrease in the quantity of sand mined each year and with no reduction in the annual royalties paid to the landowners. My colleagues have overlooked the fact, however, that the dredging equipment used by Acadian was built in 1951 and that it was capable of dredging only to a depth of 28 feet. The company managed to drill to the present depth of 50 feet on the 16.1 acre tract by lowering the water level in the pit enough to allow the dredge to function. The water level cannot be lowered any more, however, because of the danger of immediate caveins. In order to dredge any deeper, much heavier and more elaborate equipment would be required. Acadian maintains that it owns the needed heavier equipment to dredge below the present 50 feet level, but the evidence shows that even with the equipment three times as much energy will be required and the expense of bringing up the deeper sand would be much more than has been required per cubic yard heretofore. The danger of caveins also would be greatly increased if attempts are made to drill any deeper, and it may become necessary to substantially enlarge the size of the pit at the surface of the ground to enable dredging at the lower depths. Enlarging the pit, of course, would entail substantial expense in clearing additional lands, removing overburden and dredging out soil at considerable depths to provide the needed slope.
There is some indication in the record that defendants had already reached or were approaching the maximum depth which they expected to dredge from the 16.1 acre tract. The manager of Acadian, for instance, testified that a part of the overburden which had been removed from that area "settled out" in the south part of the 16.1 acre pit, and had "filled up an area of approximately two (2) acres" in that pit to the extent that it was "visible from the surface." Since the water was about 28 feet deep in the pit, it is apparent that a very large quantity of overburden, silt or waste material had been dumped or allowed to accumulate in one part of the pit which defendants claim they intended to mine. Mr. James R. Gilbert, a civil engineer, was employed by Acadian in January, 1971 (obviously in preparation for the trial of this suit), to determine the "side slope angle of stability" which could be expected after excavation below the water line and to determine the amount of sand which could have been economically mined from the property being taken here. He testified that he was unable to make a cross section of the 16.1 acre pit because "this pit was used for the deposit of dredge discharge water from the T. L. James borrow pit and therefore contains a great deal of fine silt and other materials which would not have the same characteristics as the sand in which we are interested." It seems to me that defendants either did not intend to conduct further mining operations in the south end of the pit, or that they would expect to incur considerable expense in removing the overburden, silt and waste from that part of the pit before they could resume the dredging of sand there. The majority did not mention and apparently they did not consider this circumstance.
There are other factual conclusions reached by my colleagues with which I cannot agree. The ones already mentioned, however, are sufficient to show that I could not concur in the awards which were made, even if it should be determined eventually that defendants are entitled to recover from plaintiffs the current price *483 per cubic yard for all of the sand which underlies the property being taken.
For these reasons, I respectfully dissent.

ON APPLICATION FOR REHEARING
Rehearings denied.
MILLER, J., votes to deny the application for rehearing and assigns written reasons.
HOOD, J., dissents from the refusal to grant a rehearing and assigns written reasons.
MILLER, Judge.
The applications for rehearing are denied. Plaintiff Airport Authority's application for rehearing tracks very closely the dissent to the original opinion. The arguments attempt to coerce the opinion into a mold traditionally unacceptable to our Supreme Court and thereby create a strawman. The rebuttal of our opinion is divided into two basic approaches: Denial that the method we used in making our award is correct, and denial that our computations supporting that method are correct.

I.
Basically the first criticism states that we did not award the market value of the land based on highest and best use but rather awarded the value of all recoverable sand underlying the land. It is said that we have awarded ". . . the current price per cubic yard of all of the recoverable sand underlying that property" based on our assumption that ". . . all of the recoverable sand would have been removed within that time (20 years)." (Emphasis and parenthetical clarification added.) Thus we are accused of violating the accepted principle that "It is not proper to arrive at a value of the land being condemned by taking the quantity of sand which underlies that property and multiplying it either by a royalty rate per cubic yard, or by multiplying such quantity by the price sand is currently bringing per cubic yard."
We have no quarrel with this principle but we believe it important to ascertain just what method this principle condemns. Insight into the answer to this question is offered by the cases cited for the principle and misapplied (we submit) by the dissent. A most appropriate example is given in State Through Dept. of Highways v. D. H. Sanders Realty Company, 244 La. 934, 155 So.2d 24, 26 (1963):
"Thus relying on his tests, he thought that there were approximately 12,534 cubic yards per acre over the whole area and that its royalty worth was ten cents per yard. On this basis he assumed the gravel in site to be worth $1,253.40 per acre."
This case rejected an evaluation approach that takes "x" cubic yards and multiplies it times "y" dollars to arrive at a value for land. The Supreme Court in State Through Dept. of Highways v. Hayward, 243 La. 1036, 150 So.2d 6, 9 (1963) said in quoting from 1 Orgel "Valuation under Eminent Domain," Sec. 165, p. 675.
". . . to estimate the amount of stone in situ and to multiply this amount by a fixed price per unit, this method is uniformly rejected."
That we are not guilty of such calculations is evident. We determined that the total recoverable sand was 3,311,525 cubic yards and that the average production per year based on average market needs was 93,982 cubic yards. This indicated a span of production covering 35 years. We admit an inadvertent error in our calculation of the total recoverable cubic yards of sand. The correct figure based on our calculation is 3,361,847 cubic yards not 3,311,525.[1] This error results *484 in an alteration of projected life span of production upward from 35 to 36 years an adjustment which gives greater emphasis to the difference between our method and the method condemned by the jurisprudence.
Due to the possibility of cave-ins, shallower production than anticipated, less than 100% efficiency, presence of clay pockets and competition from other materials we reduced the production life span to 20 years. We then multiplied the contract royalty rate times the yearly production and arrived at a rounded off yearly income which was discounted for the 20 year period by a discount factor of 8.000. What is initially important to note is the effect of the reduction of the production life from 36 years to 20 years. We still accept 20 years as a reasonable life span for production. By taking the yearly income of $30,000 (35¢ per cubic yard times 93,982 cubic yards per year) and multiplying it times a factor based on 20 years, we reduced the amount of total cubic yards upon which our award is based by more than one third. The total recoverable cubic yards, 3,361,847, was stretched out over 36 years due to the yearly depletion of 93,982 cubic yards. When we maintained that yearly production but reduced the production life to 20 years we cut 16 years times 93,982 cubic yards or 1,503,712 cubic yards off the amount of recoverable sand. Therefore our award was based not upon all recoverable sand but less than two-thirds of it, and we did not therefore assume that all recoverable sand would be removed within 20 years. We rounded off annual income from $32,893.70 to $30,000 thereby effectively decreasing annual projected production below 93,982 cubic yards. This works a further decrease in the number of cubic yards upon which our award is based.
Next it is said that we did not consider ". . . what a prospective purchaser would pay for the property being taken" as we made ". . . no attempt to determine the highest price the property would bring if it were exposed for sale on the open market." We are accused of assuming ". . . that a prospective purchaser would pay a price for the property which amounts to the exact sum which he might expect to get back in the next 20 years . . ." (emphasis added). Attention need only be directed to the purpose and effect of our use of the discount rate of 8.000.
Preliminarily it should be pointed out that the royalty rate of 35¢ per cubic yard was a payment that could be expected to be paid either in toto to the landowner as lessor or (as here) partially to the landowner-lessor and partially to a lessee-sub-lessor without expenditure of effort or expense on their part. This is borne out by the fact that in the late 50's Acadian sub-let its production rights on the Roy property to another producer who absorbed all production costs and paid Acadian 40¢ per cubic yard royalty in 1959 for sand produced. Only fine sand was being produced, and that was from a part of the land not presently subject to expropriation. Acadian's only effort was weighing the produced sand to verify the production. With no expenditure on their part they received a 29¢ overriding royalty while the Roy heirs, also with no effort, received a royalty of 11¢ (Proffer, pp. 15-19). Therefore capitalization of the entire rental of 35¢ per cubic yard as opposed to the gross-net determination sometimes required was indicated.
*485 In discussing the nature and structure of capitalization rates Professor Dakin (Melvin G. Dakin and Michael R. Klein, "Eminent Domain in Louisiana" Sec. 6, Par. D p. 232) quotes from S. Kahn, Real Estate Appraisal and Investment (1963):
"The procedure whereby the market value of a parcel of real estate may be estimated from an analysis of the quantity, quality, and duration of the net returns is known as capitalization. Capitalization is thus a means by which appraisers express their opinions of the amount of money a typical investor would be justified in spending for ownership of a parcel of income producing property." (Emphasis added).
Professor Dakin offers further clarification Dakin & Klein, supra, p. 233:
"Thus, while the actual yield on an investment cannot be determined until the property is sold, the appraiser's chief function lies in estimating the original justified cost. The . . . (justified) cost becomes synonymous with the estimate of market value and reflects his opinion of the amount to be paid in order to realize an expected yield, or return, on the investment. This investment or market value thus bears a direct ratio to the yield, and the ratio is expressed as a capitalization rate.

The capitalization rate is determined by the characteristics of the property to be appraised. The rate, therefore, is an expected, or anticipated, rate of return necessary to attract capital to the investment compared with all other forms of investment opportunities. In this respect it also measures the quality, quantity, and possible duration of the income stream." (Emphasis added.)
That the appropriate factors were taken into consideration in arriving at the rates from which the rate used was chosen is evident from the following statements of Mr. Chappuis:
"Capitalization rates are merely a technique for examining the minds of prospective buyers, not mathematical formulas which have nothing to do with people . . .
In the Income Approach the investor will first wonder how much gross income the property will produce. He then contemplates his amount of expenses. He also considers debt service, how much is left to pocket and how does that amount compare with the time it will take to get the equity capital. He is still looking for a terminal invested capital and the return of that capital which is the accepted investment philosophy. . . In attempting to select the capitalization rate the appraiser must remember to find one which reflects the reactions of the typical buyers in the market. Other factors which must be considered are the certainty of the anticipated income the risk involved, the market stability of the property, and the problems of management . . ." (Chappuis report; 55, 56.)
The charge that we failed to consider "what a prospective purchaser would pay for the property being taken" is baseless.
Interestingly enough, the dissent intimates that a recovery based on valuation of the land as sand bearing land is somewhat inequitable in that ". . . plaintiffs can never mine or use that sand." The fact that plaintiffs' intended use of the land will thwart attempts by plaintiff to market the underlying sand is irrelevant to the determination of the market value of the property as sand bearing land. The value is fixed ". . . with reference to the loss the owner sustains. . ." not the loss the plaintiff sustains by way of his contemplated use. Cf. United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063. State Through Dept. of Highways v. Hayward, 243 La. 1036, 150 So.2d 6, 8 (1963).
The dissent states that the majority opinion would allow recovery for oil, *486 gravel, clay, etc., ". . . whether those substances had been mined from or were ever known to exist on the property prior to the time the expropriation suit was filed." We stated that market value must be based on highest and best usethis use" . . . being the most favorable employment to which the property is adaptable and may reasonably be put in the not too distant future." (Emphasis added.) State Through Dept. of Highways v. Rapier, 246 La. 150, 155, 164 So.2d 280, 282 (1964). The emphasized portions are the keys. It matters not whether the deposits were previously undiscovered and unused if they are present and the market for them is of a nature to substantiate a belief that it will induce their production within a reasonable time. When this is the case it is proper to consider these deposits in valuing the land unless their development is inconsistent with the highest and best use of the land. Where their development is the highest and best use of the land then consideration of this development is mandatory. 4 Nichols on Eminent Domain, § 13.22 p. 101. Here the sand deposits had been produced for several years prior to the expropriation.
It is stated that we rejected plaintiffs' appraisers' valuation because we believed that ". . . they failed to consider the sand deposits" when, says the dissent, they did consider and value the land on the basis of its sand potential. The reason for our rejection of plaintiffs' appraisers is that they did not adequately consider the sand deposits on the subject land. That they failed to properly consider the sand deposits is shown by a detailed study of their expert testimony. We are reluctant to extend this opinion, but an answer to the application for rehearing requires this detail.
Plaintiffs' appraisers attempted to use "comparable sales" to arrive at a price per acre for each parcel of the tract taken. We have noted that they worked together to reach a single appraisal. As to the 16.1 acre "pit land" (designated by plaintiffs' appraisers as different from unopened "sand land") plaintiffs' appraisers used two salesAct No. 467792, Leo Knight to Daly Sand and Gravel Incorporated ($9,500), and Act No. 467793, Jim Roy Development Company Incorporated to Daly Sand & Gravel Inc., ($24,000)both dated Dec. 21, 1964, and relating to the same tract of land. At this point it is interesting to refer to Mr. Babineaux's deposition where, in referring to the comparability of the sale from Jim Roy to Daly, Mr. Babineaux said ". . . that sale included equipment . . . we did not put no weight on that because we didn't know the value of the equipment involved . . . there was no way to know what the value of the equipment was." Tr. 151-152 (Vol. 3). He admits at Tr. 97 that he was still ". . . unable to ascertain the value of the equipment involved" yet he now sees fit to use the sale as a comparable.
Further insight into the accuracy of this report is gleaned from the fact that plaintiffs' appraisers, in using the two above sales as comparables, computed the price per acre on the assumption that the sale from Mr. Knight to Mr. Daly conveyed a full ½ interest as did the sale from Roy to Daly. Tr. 107. Babineaux states that Mr. Daly told him this was the case. Tr. 99 & 102. However Mr. Daly states that he acquired only a ¼ interest from Knight. Proffer, p. 41. This was borne out by the discrepancy in price on these simultaneously recorded sales. Babineaux then states that even if only a ¼ interest was acquired, his computation per acre would still be valid because he included the value of the equipment transferred in Roy's sale in the computation per acre and this would offset the value of the ¼ interest not transferred. Tr. 84. Then Babineaux turns around and says that this equipment had only "a negligible value." Tr. 104. Mr. Mouton admitted that if only a ¼ interest was transferred their computation would be incorrect. Tr. 143.
Plaintiffs' appraisers, on the basis of the inaccurate assumption, arrived at a price per acre in the Daly sales of $453. For unexplained *487 reasons of time and location, they reduced this figure, for application to the 16.1 acre pit, to $400 per acre. Babineaux did state Tr. 98 that part of this adjustment downward was due to the fact that the Daly property was closer to the Evangeline Thruway and because of "physical aspects of the property." However, the most important physical aspects of these sand mining properties, quantity and quality of the deposits, were not taken into account. Tr. 68-69. Babineaux and Mouton merely assumed that the physical aspects of the properties involved (Daly's pit and Defendants' pit) were identical in physical aspects. Tr. 70 & 128-129 & 135-136. These experts, who combined, had no experience in the field of appraisal of mining properties, stated that ". . . there was not a great difference in the value of the sand itself, after it had been mined." Tr. 129. Furthermore, counsel for plaintiff instructed them not to consider such factors as quantity and quality of the sand deposits in arriving at their conclusions. Tr. 136.
This nightmare of inaccuracy continues into the valuation of the 18 acres (plaintiffs' appraisers used 17.2 acres of "sand land" as opposed to "pit land"). For a comparable sale they used act of sale number 523191, dated April 19, 1968, from Patrick Bonin to Daly Sand & Gravel, Inc. This tract consisted of 12.91 acres of which 9 acres were sand land and approximately 3.91 acres recreational. Tr. 51. The land sold for $540 an acre. Plaintiffs' appraisers adjusted the price up to $550 (unassigned reasons) and applied it to the 18 acres (remember though they used 17.2 acres) of sand land on the taken property. It should be noted at this point that the application of this adjusted figure to the subject 18 acres was on the basis that both sites had a highest and best use for sand mining operations and that at the time of the Bonin sale the 12.91 acre tract was intact without a pit as is the subject 18 acre tract. Tr. 51-52. However, in valuing the entire subject tract, plaintiffs' appraisers saw fit to carve out parcels therein according to a definite per acre highest and best userecreational, pit, and sand land. There was no overlapping of sand acreage into the recreational acreage or vice versa. However, in using this "comparable sale" (Bonin sale), they take a 12.91 acre tract which includes both sand and non-sand or recreational land, arrive at a price per acre based upon the price paid for the entire 12.91 acres, adjust it up slightly, and apply it to the incorrect figure of 17.2 acres under which every square inch is mineable sand. Plaintiffs' appraisers point out in their appraisals that it is their belief that buyers appreciate and consider in purchasing a piece of land a difference of $220 per acre between sand and recreational land. This consideration which most certainly must have affected the purchase price of the Bonin's land due to the presence of 3.91 acres of recreational land was not overcome by an $8 per acre adjustment in the rate applied to the taken 18 acre tract.
However this is insignificant compared to the discrepancy caused by the appraisers' failure to consider the volume or quality of the sand deposits on the comparable and taken tracts or the income from them. Tr. 51 & 125-126 & 130, 135. Nor did they adjust for differences in the depth of overburden. Tr. 65, 69, 126-127. This is in utter disregard of Mr. Mouton's testimony: "From a practical standpoint, if the quality of a product which comes from a piece of land is a better quality than what comes from another piece of land it naturally follows that the better quality should bring a higher price." Tr. 130-131. Mr. Babineaux stated: "Any investor buying any type of property definitely will look at the income he can derive from his investment." (Emphasis added.) Tr. 73. Also Mr. Babineaux admits (Tr. 116) that the market value of sand mining land is affected by the amount of overburden it has. In the face of these admissions, plaintiffs' appraisers state that they valued the sand and pit properties on the taken land as "substantially" the same as the "comparables." Tr. 129.
*488 Yet they totally disregarded the quantity and quality of the sand deposits on the respective tracts.
We state againthe record established that there were no comparables. However, plaintiffs' experts didn't capitalize rent to reach the value of defendants' interests because they concluded that they had "comparables" from which to work. Tr. 91.
Plaintiffs' appraisers next state their understanding of the law. "I was advised by counsel, and from my own knowledge and experience, that the cubic yard royalty paid was for value in a business and not part of a rent." Tr. 114. This, as pointed out in the original opinion, is incorrect. Babineaux says that economic rent is the rent recited in the contract of lease (Tr. 112) and says that in the present case the economic rent is $4.80 per year per acre based on the $1000 per year minimum rental set for 219.8 acres in the original lease. As pointed out in the discussion of leasehold interest and advantage in the original opinion, this is totally incorrect. Among other factors, it ignored the amended contract negotiated several years before the expropriation.
Now as to defendants' appraisers, while we admit that Mr. Chappuis and Mr. Angers are highly qualified appraisers, we must also recognize that even qualified appraisers cannot value property in the mold of the comparable sales approach where comparable sales don't exist. That comparable sales don't exist is evidenced by the following random selection and incorporation of multiple variables to arrive at valuations.
As regards Mr. Angers' valuation of sand property (comparable sales approach), we note that he designates 80 acres (the entire scope of the revised lease) as having such use. He thereby incorporates a considerable amount of acreage under which there are no mineable sand deposits. However, he tries to adjust by way of changing the percent of sand land in his "comparable" sales as shown later.
Mr. Angers basically uses the Knight, Roy and Bonin sales as comparables. He recognized and computed the price per acre in the Knight sale upon the correct assumption that the sale transferred only a ¼ interest. Furthermore he deducted $5,000 from the sale price of the Roy sale for equipment and computed the price per acre on the reduced figure of $19,000. He arrived at the following prices per acre: Knight $514; Roy $428; Bonin $542.
On the basis of this analysis he concludes that the average sale price for sand mining land in the past has been between $500-$550 per acre. He further notes (without explaining) that this type of land has sand deposits covering approximately 50% of the land. We note the contradiction between Angers and plaintiffs' appraisers as to the percent of sand land in re the Bonin sale. He does point out that the comparable properties have a narrow frontage or exposure on their respective sand deposits (undesirable according to Angers [Proffer, p. 30]presumably due to the increased likelihood of caveins). The sand found on these lands is fine sand suitable only for fill purposes.
Angers states, without citation of authority, that fine sand sells for $1.25 per cubic yard while coarse sand sells for $2.50 per cubic yard. With an expense factor of 62.5¢ per cubic yard for recovery of each type of sand, this, says Angers, leaves coarse sand with a value 3 times as great as fine sand. Angers therefore concluded: that the value of land having only fine sand is 1/3 that of land with coarse sand. We take note of the fact that in order to make such a blanket direct transposition of values on a market data comparability approach, one would have to assume that the volumes involved in the respective tracts were identical. Angers makes no showing in his market approach that he ever compared the volumes of the taken tract and the "comparable" sales.
He states that the overburden on defendants' land averages 10 feet while the average on the comparable sales is 16 feet.
*489 Angers decides on a base price of $500 per acre from his "comparables" and since he determines that the sand land and not the recreational portion is the variable factor in the price, he makes the following calculations.

1. Sales of fine sand land $500 to $550
2. Value of deposits of coarse sand is
 3 times on 50% of the $500 price
 ½ of 500 = 250 × 3 = $750
 2/3 of 750 = 500
 ---------
 $1,050 for coarse sand land per acre.
  ($50 apparently added on because
 of upper limits price of $550)
3. Adjustment for 10' as to 16' overburden
 at $400 an acre ft on 50% (portion of
 sand land) of the difference between
 400 × 10' and 400 × 16'
 400 × 10 = 4,000; 400 × 16 = 6,400
 6400
 -4000 ½ of 2400 = 1200
 ____
 2400
 TOTAL $2,250 an acre on taken
 sand land
Final valuation = 80 acres × $2,250 = $180,000.

Anger's appraisal is open to several criticismssome of which have already been indicated. He uses a 50% sand land comparability factor which relates to surface area and not volume so that in failing to compare volumes he has ignored one significant area of incompatibility between a given sale and the taken land. However, this is not the only reason a rigid transposition of the above adjustment of 3 times the price per acre should not be used. Angers apparently realized that in multiplying his price per acre for land times 80 acres he was including recreational land in the computation. Therefore he determined that only 50% of the land in the comparable sales had sand on it and he therefore adjusted only 50% of the price per acre. Ignoring the effect on price of a difference in widths and volumes of deposits (as Angers did) the transposition of the $500 price per acre adjusted only as to $250 of that price is improper because it assumes that the taken 80 acre tract like the sales, has 50% sand and 50% recreational land which is, as a unit best suited for sand mining. This conclusion is not justified. Of the 80 acres under lease, only 34.9 acres (less than 50%) is actual sand land. Therefore the adjustment of 50% of the sale prices used was adjustment of too much of those sale prices to permit a direct transposition thereof to the subject tract.
Angers then makes an adjustment for the overburden removed from the pit. Without justification for the money figures involved, he adds the sum derived from the following computation: 10' × $400 per acre foot (cost of removal) × 16.1 acres amortized 50% due to sand removed in the 16.1 acre pit$32,200. This is considered an improvement and is added to the $180,000 previously computed for the sand land.
We find this unacceptable. Angers, in reaching his price per acre for 80 acres (including the 16.1 acres of the pit), included an increase in value due to the 10 foot overburden as compared to the 16 foot overburden on the sold properties. This figure ($180,000) arrived at by way of the price per acre thus adjusted included the 16.1 acre pit and thus the $180,000 figure was partially composed of a price per acre, thus adjusted, times the 16.1 acres of the pit which had no overburden. Then he adds to the $180,000 figure an improvement consisting of removal of overburden equaling $32,200. Therefore the surface area over the 16.1 acre pit was adjusted upwards twice for inconsistent reasons.
Mr. Angers made no adjustment for time or location.
As to Mr. Chappuis, he uses the same three sales that Mr. Angers did but he divided the sales into two groups to compute two different prices per acre which he later averages. The two groups are made up of the Knight and Roy sales on one and the Bonin sale on the other.
Probably the most significant error that Chappuis made was an apparent transposition of numbers in regard to the total acreage underlain by mineable sand. He uses the figure of 43.1 acres instead of 34.1 acres throughout his report and this error permeates several parts of his appraisal with inaccuracy.
*490 As to the Knight sale, it will be recalled that Angers found no equipment involved but Chappuis found $2,000 of equipment involved and reduced the price of $9,500 accordingly. Chappuis is the only appraiser to allege the presence of equipment in this sale. The result was that although Chappuis recognized a transfer of a ¼ interest in the sale, his price per acre was $405 as compared to Angers' $514. On the Roy sale, Chappuis figured a reduction of the price paid ($24,000) on the basis of a transfer of $9,000 of equipment. Angers had found $5,000 worth of equipment. Therefore Chappuis' price per acre was $417 while Angers' was $528. As to the Bonin sale, Chappuis (contrary to every other appraiser) found a sale of 12.69 acres instead of 12.91 acres. As a result his price per acre was $551.61 as compared to Angers' figure of $542.
Chappuis finds a "comparable" market price first on the basis of the Knight and Roy sales as a unit and says that since a ½ interest (Roy sale) sold for $15,000, the whole would sell for $30,000 (ignoring the increase in price usually brought about by the acquisition of a complete interest). Since the total acreage of this tract was 73.602 acres, he finds a price per acre of $407.60. Then he states (without citing authority) that of this 73.602 acres there was 10 acres of sand deposit, and this is contra to Angers' assumption of 50% area sand deposits. This leaves 63.602 acres of recreational land. He then takes the figure of $300 (arrived at by way of an adjustment of his price per acre for recreational land) and multiples this times 63,602 acres. The result is $19,080 which is subtracted from $30,000 leaving a residual of $10,920. Chappuis reasons that the 10 acres of sand land sold for $10,920 or $1092 an acre.
He takes the base price of $1092 per acre and adds an arbitrary 20% because caveins are avoided by nature of the larger width of the subject property. Next, Chappuis' transpositional error (43.1 instead of 34.1 acres) results in another error incorporated into his basic price per acre. He adds $400 per acre on the assumption that 37% of the overburden has been removed from the sand land. The percentage is based on the removal of overburden from the 16.1 acre pit. However when it is realized that the total sand acreage is 34.1 and not 43.1 acres, it becomes evident that the removal of overburden on 16.1 acres is removal of 47% of the overburden and not 37%. We can only conclude that the $400 per acre adjustment would be different had he realized that the percentage of overburden removed was substantially greater than 37%.
He then adds $400 an acre (as opposed to Angers' $500 an acre) for coarse sand quality and $273 an acre for time differential. Finally, he commits an error in adding $163 an acre to the price per acre due to the fact that there is a mining operation functioning on the taken land. At this point he departs from valuing land itself on the basis of the qualities and assigns a value to the land on the basis of the mere presence of a sand mining company operating thereon.
The total price per sand land acre by this approach is $3,046.
Next Chappuis calculates a price per acre for the sand land based on the Bonin sale. Notehe used 12.69 acres as opposed to the generally accepted 12.91 acres as the acreage involved in the sale. Without segregating the value of sand and recreational land in the Bonin sale (as was done by all other appraisers and by Chappuis himself in dealing with the Knight and Roy sales), he multiplies the base price per acre, $551.61 times 43.1 acres (note inaccuracy) for a base price of $23,775 which is adjusted and added to.
He adjusts upwards 10% or $2,377 for time and 20% or $4,655 (should be $4,755) for size. Next he adds $4,000 per acre on 16.1 acres (total of $64,400) for removal of overburden. This figure was not amortized 50% due to the removal of fine sand (as Angers had done). Rather, $1,000 *491 per acre for 16.1 acres is added to the sum totaled due to the fact that the fine sand had been removed.
Chappuis adds $80 × 43.1 acres for corings and 5% of $23,775 ($1180) for location. Finally he adds 10% of $23,775 for the coarse grade of sand and $7,500 for the fact (unacceptable as per previous reasons) that there is a sand mining operation in progress on the taken land. The price per sand land acre he arrives at is $2919.07.
Chappuis takes his two prices per acre, $3,046 and $2919.07, and arrives at a compromise figure of $3,000 an acre. This is multiplied times 43.1 acres (inaccurate). To the result ($129,300.00) he adds the value of the recreational land.
In computing severance damages, he attributes 9.5 not 10.7 acres to the isolated tract.
In view of the inaccuracies in Mr. Chappuis' report we find it impossible to accept the dissent's view that the report ". . . is based on sound reasoning and good authorities" and that ". . . all of the other evidence supports his conclusions."
By way of his capitalization of income approach, Mr. Chappuis found the value of the 80 acre lease to be $149,280.00. Then this figure, arrived at by way of income capitalization, is broken down by way of figures computed on a comparable sales approach. He assigns 36.9 acres a value of $375 per acre as recreational land. Next he takes 27 acres and assigns a value per acre of $600 as unopened sand landthis arbitrary figure is unsupported in his report. The total value for these acreages is set at $30,037.50. He subtracts this figure from $149,280.00 and arrives at a figure of $119,243.00. This figure is divided by 16.1 acres to arrive at a value per acre for the pit of $7,406.39. Note that the combined sand acreage under this computation is still the erroneous figure of 43.1, i. e. 27 plus 16.1 acres. Next, he rounds off the figure of $7,406.39 to $7,405 and arrives at the sum of $119,220.00 for the 16.1 acre pit.
The next calculation is interesting. The $119,220.00 figure is based on a per acre value for pit land arrived at by a dissection of the value of the total 80 acres valued by way of income capitalization. This dissection and thereby the price per acre for pit land was based on 27 acres of unopened sand land at $600 per acre. However now Mr. Chappuis multiplies $600 times only 17.2 acres and gets $10,322.00. The same $600 times 27 acres equals $16,200.00. Chappuis is obviously forcing his acreage down to bring it in line with the correct figure of 34.1 acres and thereby bring his total amount (after addition of the recreational land) down so as to compare with his income capitalization figure of $155,640.00. This he does by arriving at a figure of $153,415.00. The inaccuracies and incongruities in this valuation, accepted by the dissent, are such as to render the result totally unacceptable.
Next we take note of the fact that in the original opinion we did not accept the appraisals of Mr. Wilkes or Mr. Parker. Note should be taken however of the fact that these two appraisals (each valued the expropriated property at over $300,000) were the only ones offered by defendants which purported to assess the interest of both owners and lessees. Mr. Chappuis and Mr. Angers did not consider the leasehold advantage in any of their appraisal approaches. Indeed Angers stated (p. 4 of his report) ". . . this appraisal is of the Leased Fee or Owner's Position therein" while Chappuis stated (p. 3 of his report) that his purpose was "To estimate the market value of the encumbered fee simple title . . ."
The dissent chose not to discuss ". . . how the total award for the property taken should be apportioned. . . ." The "total award" referred to is $155,000 or the value of the owners' interest. To apportion this award would run counter to the rule that ". . . the expropriator cannot *492 focus narrowly on the value of landowner interest, and expect the lessee to derive his recompense from that award or vice versa." State of Louisiana Through Sabine River Authority v. Carter, 293 F.Supp. 1171 (W. D.La.1968).
It should be noted that our award of $162,087.50 to the landowners for their interest is not "substantially" greater than the $155,000 advocated by the dissent. It is only when the lessee's award is added that our award is substantially greateras it should be under the evidence presented.

II.
The second half of the criticism of our opinion deals with the accuracy of our computations. It is alleged that we ". . . have incorrectly assumed that the walls of soil which surround or enclose these sand deposits are vertical, and that there is no side slope angle." We pointed out in our opinion that our calculations were based on a side slope angle of 1 to 1 above water and 1 to 1.5 below the water level.
The dissent and the plaintiffs would have us accept the testimony of Mr. McGee in preference to that of the six witnesses called by defendants. For the following reasons we find this undesirable.
Mr. McGee is a registered civil engineer with 10 years of experience. On cross-examination he admitted that overburden was an expense factor and that the amount of overburden would affect the value of land for mining purposes. He testified that the sand on the defendants' land was generally of a fine nature or of the same quality as found on Daly's properties and the airport's land. He computed that there were 1,300,000 cubic yards of recoverable sand on defendants' property. His calculations were based upon an "angle of repose" of 1 to 1 for the first 6 feet of sand and 3 to 1 for the remaining depth. He steadfastly maintained that Mr. Daly could obtain coarse sand by a hydraulic separation method as did Acadian.
Mr. McGee's opinions were demolished by six witnesses for defendants. First offered by defendants was Mr. Holloway. This man is sales manager for five sand and gravel companies and is owner of another. He has had extensive experience in evaluating and purchasing sand mining properties all over Louisiana.
He stated that the defendants' property has the only material in the Lafayette area, within a 75 mile radius, capable of meeting Louisiana Department of Highway's specifications for production of asphalt and concrete. He knows of no other deposit in the whole state of Louisiana which enjoys such a competitive advantage for material of this type.
The next witness for defendants was Mr. Ferd L. Goodman. He is an expert registered professional engineer and his experience in the construction field grading and pricing concrete and asphalt materials spans 30 years14 of which were spent in the Lafayette area working for Barber Brothers Contracting Co.
He states that the only pit in the Lafayette area which is capable of producing sand coarse enough to meet specifications required by the Louisiana Department of Highways for the manufacture of asphalt and concrete is defendants' deposit. Barber Brothers has extensive coarse sand deposits in Baton Rouge but the cost of transportation to Lafayette is prohibitive. The result is that the Acadian Corporation has ". . . a monopoly on the asphalt and concrete sand market in the Lafayette area."
Recently, in attempting to complete a runway project for the Lafayette Airport, Barber Brothers had attempted to obtain sand suitable for asphalt from a pit on the Airport propertyonly 3000 feet from defendants' land. Even when hydraulic separation methods were used (same as those used by Acadian) it was impossible to obtain sand of a sufficient coarseness to complete the job. As a result, sand from Abbeville was trucked in at great expense and then a lightweight material from Irwinville *493 was added to the sand also at great expense. This expensive mixture could be used for asphalt.
Mr. Ralph L. Davenport, a civil engineer with 20 years in the construction and asphalt marketing business and the vice president, since 1965, of a civil construction company (Inland Corp.), stated that the deposit subject to taking had coarse sand as compared to the fine sand on the surrounding properties.
Also testifying by proffer was Mr. Thomas S. Broyles. He has 30 years experience in highway, heavy construction and dredging operations. He has been associated with Acadian and Inland Corporations for the past 10 years. Mr. Broyles testified that Acadian's equipment sand could mine sand on the expropriated tract to a depth of 110 feet.
Mr. James R. Gilbert, an expert registered professional engineer with 21 years experience in dredging and subaqueous excavation, was called by defendants on proffer. He is totally unconnected with the defendants. He pointed out that only by a determination of the side slope angle of stability (determined by examination of material in its natural state) can an accurate estimate of the volume of recoverable sand be obtained. The widely used angle of repose (determined by a laboratory examination of samplesthis approach was used by McGee) is not nearly as accurate and will show a substantially lesser volume than will the side slope angle of stability.
He stated that the slope above water is 1 to 1 and below water it is 1 to 1.5. In his opinion, mining to a depth of 100 feet with the equipment owned by Acadian is "entirely feasible."
The last of these witnesses called by the defendants was Mr. W. L. Daly, owner and operator of Daly Sand & Gravel, Inc. He has conducted sand mining operations on two properties in the immediate vicinity of defendants' land for the past several years. He has mined to a depth of 50 feet on both properties and has used the hydraulic separation method (used by Acadian) in an effort to obtain coarse sand. He has been unsuccessful in these attempts and states that Acadian (working on the Roy property) is the only producer in the Lafayette area who has been able to produce the coarse sand. This coarse sand brings a much higher price than the fine sand which he produces.
Summing up, Mr. McGee, with 10 years general engineering experience, is relied upon by the dissent and by plaintiffs to rebut six witnesses with a combined total of over 100 years of experiencesome of which is in highly specialized fields. He even contradicted the direct testimony of Mr. Daly as to the productiveness of hydraulic mining on Mr. Daly's land.
Next we are accused of being arbitrary in selecting the seven year period (1963-1969) upon which to base our projection of annual market generated depletion. It is suggested that a 10 year period (1957-1966) would be more appropriate. The dissent states that the period of time from 1967 to 1969 should be excluded because "it is apparent that defendants stepped up their mining operations tremendously after the suit was filed . . . endeavoring to remove as much sand as possible . . ." before the taking. This is totally unsupported in the record and runs directly counter to the clear import of the statements of Mr. Broyles.
Mr. Broyles points to the decline in production in 1968 and 1969 (which the dissent admits) and states that this was due to the threat of expropriation. These statements and the fact of the 1968-1969 decline in production indicate that the production between 1967 and 1969 was directly related to market demand and Acadian's contractual ability to meet that demandnot a desire to produce and stockpile sand in the face of a saturated market.
Production charts (at the end of Mr. Wilkes' report) indicate the increase per cubic yard in the ratio of coarse sand to *494 fine sand in favor of the coarse sand after 1967. The statements of Mr. Broyles indicate that as this ratio increased, the product most desired by the marketcoarse sand became increasingly available to Acadian. Each cubic yard removed contained a higher and higher content of coarse sand. With the market demanding this product, Acadian was able to enter into more and more contracts and thus became encouraged by the market to produce greater quantities. The production charts show that this high ratio of coarse sand continued into 1968 and 1969. It is unlikely that if defendants were stockpiling sand in an effort to remove ". . . as much as possible. . ." they would slow down in 1968 and 1969. Mr. Broyles version (the only one in the record on this point) is more believable i. e. that Acadian was producing sand in 1967, 1968, and 1969 in response to market demands except to the extent that production did not keep pace with market demands in 1968 and 1969 due to the fact that certain long term contracts becoming available to Acadian in those years had to be rejected because they could not, due to expropriation, meet the extended delivery dates required under them.
The use of the years between 1957-1962 (advocated by the dissent) for purposes of calculating an average per annum production from the taken deposit is unacceptable.
It is uniformly accepted by everyone in this case (indeed it was stipulated by the parties) that of the property directly taken, only 34.1 acres have underlying sand. It has been adequately demonstrated that with the exception of the 0.8 acres in the 10.7 acre isolated tract, coarse sand is found only on this 34.1 acre area. We also find that the market for this sand in the Lafayette area is great and will become much greater in the future as the city grows (Chappuis's report p. 16; Anger's, p. 6) and that the 34.1 acre deposit has an effective monopoly on the market. Therefore it would be improper, in computing a projected annual production, to consider production by the defendants from an area other than the 34.1 acre tract. Only this peculiar deposit is being takenproduction figures from deposits of a fine nature not being taken should not be considered. The testimony of Ralph L. Davenport (Proffer p. 20) is that from 1956 to 1960 sand (fine) was taken only from the south end of the Roy tract in an area not subject to the expropriation. Therefore, the production between 1956-1960 cannot be used in computing a projected yearly production average for the 34.1 acre deposit.
Some time in 1960 implementation of the present site began. It is true that we did not use the production in 1961 and 1962 (and part of 1960) but we believe this production effort was not representative. In 1963 the lease agreement was renegotiated to reduce the acreage covered from 219.8 acres to the present 80 acres and the contract royalty rate increased from 10¢ to 22¢ per cubic yard. Prior to this time only fine sand had been found on the Roy land even on the 34.1 acre tract. See production charts. Although Acadian had once had somewhat of a market advantage on this fine sand due to the lack of competition, this disappeared due to the arrival of people like Mr. Daly. (Mr. Broyles p. 33 of Proffer.) Therefore, when mining began on the 34.1 acre tract in 1960 and production turned up mostly fine sand, little incentive existed for a decided increase in production. By 1963, however, Acadian realized its search had paid off and that a coarse sand deposit had been found. (Mr. Davenport p. 22 of Proffer.) Acadian promptly reduced the area of the lease to that in proximity with the deposit and increased the royalty payments so as to be more in line with the value of the sand. By 1967 it had become obvious by way of ratio production figures, that coarse sand was not only present in mineable quantities but was plentiful. Therefore Acadian could enter more contracts of a short term nature. Production therefore increased again. Given this knowledge on the part of Acadian and the fact that the market will almost *495 surely expand considerably in the future, we find that the average production between 1963-1969 is the most acceptable figure.
Due to the fact pointed out by the dissent, that production from 1960-1962 was negligible, the average figure based on 1963-1969 production included production of most of the upper fine sand layer which must be penetrated before reaching the coarse sand. Therefore the figure is applicable to unopened areas of the 34.1 acre deposit. Possible slowdowns in average production in the future attributable to opening of new pits has been more than compensated for by our rounding off annual production downward from $32,893.70 to $30,000.00 and the fact that all of defendants' appraisers pointed out that the market for the sand will increase considerably as Lafayette grows.
Finally, the dissent contends that our opinion awarded recovery on the premise that every grain of recoverable sand would be removed without difficulty within 20 years. The dissent cites the danger of cave ins and the settling of silt in the pit as proof that not every grain can be so removed. We did not rest upon these premises.
Mr. Broyles, with 30 years experience, testified that although there has been settling of silt in the pit, the mineable area is still over 16 acres. Mr. Gilbert, with 21 years experience in subaqueous excavation, testified that it was "entirely feasible" to excavate to 100 feet with the equipment owned by Acadian. It ". . . seems to me . . ." says the dissent that the south end of the pit could not be mined without considerable expense. Mr. Gilbert's and Mr. Broyles's expert testimony refutes this suggestion.
An interesting note is that the dissent made reference to Mr. Gilbert as a man employed ". . . obviously in preparation for the trial of this suit." If this impairs Mr. Gilbert's credibility, then all appraisers as well as most experts in all types of suits would suffer from an impairment of credibility. We differ.
Plaintiff has filed exceptions of no right and no cause of action against Acadian. These exceptions first appear in this suit on rehearing and therefore do not meet the requirement of LSA-CCP Art. 2163 that peremptory exceptions filed for the first time in appellate court be filed prior to submission of the case for a decision. Therefore these exceptions are untimely and are not considered. It is interesting to note that plaintiff, in both his original and supplemental and amending petitions, took positions directly contrary to those taken in these exceptions. In those petitions he stated that Acadian ". . . is owner of sand and shell leases affecting the lands herein desired to be expropriated and should be made a party herein. . ." Vol. II Tr. 6 and 43.
Counsel for lessor-landowners suggests that we erred in failing to award a value for the reversionary interest on 45.9 acres of recreational land subject to lease. He argues that Mr. Chappuis's statement (p. 60 of his report) to the effect that the "reversionary interest" was too speculative to admit of award was limited in scope to the sand production area. Even if this be the case, and we are not satisfied that it is, we believe that the 45.9 acres is not properly the subject of an award. This land was subject to a recorded sand lease which we have shown will last at least 20 and maybe 36 years or longer. It is true that the laws of Louisiana guarantee a person the right to sell a hope but they do not guarantee him a buyer. Defendants did not establish that a reasonable and prudent investor would buy such an interest in land made so tenuous and uncertain by the presence of a lease of undeterminable length.
Defendants request that we make specific awards in relation to expert fees and other costs which plaintiffs were condemned to pay. These fees, as well as any other proper cost, can be fixed and taxed under a rule *496 filed for that purpose in the trial court. LSA-RS 13:3666B (2) and LSA-CCP Art. 1920. Due to the lack of evidence in the record relating to the appropriateness of the claimed fees and to the possibility that it may be necessary to elicit information from these experts and others claiming fees, we believe that the trial court is in a better position to fix these fees and defendants should proceed by rule in that court to recover these amounts.
The applications for rehearing are denied.
HOOD, Judge (dissenting).
I respectfully dissent from the majority's refusal to grant rehearings in this case. In my opinion the following action should be taken:
(1) The application for rehearing filed by plaintiffs, the Parish of Lafayette Police Jury and the Lafayette Airport Commission, should be granted.
(2) The application for rehearing filed by defendants, J. Maxime Roy, et al, should be granted, but limited to the question raised relative to the fixing of the amount of expert witness fees.
(3) The application for rehearing filed by defendant, Acadian Development Corporation, should be granted, but limited to questions raised relating to the fixing of expert witness fees.
(4) The exceptions of no right and no cause of action filed by the Parish of Lafayette Police Jury and the Lafayette Airport Commission should be referred to the merits and fixed for argument at the time the case is argued on rehearing.
NOTES
[1] As authorized by LSA-R.S. 2:138 et seq. and LSA-R.S. 2:381 et seq.
[2] The airport road runs near the western edge of defendants' property and as to both parties involved, was the most convenient means of access for defendant to cross plaintiffs' land to the public highway.
[1] This error resulted in the following manner. We accepted the figure of 3,361,847 recoverable cubic yards (see first part of original opinion) for purposes of our award. This figure took into account the side slope angle of stability. However in the actual computation of our award we attempted to first determine the total amount of sand underlying the land. It was our intention to reduce this figure to the properly adjusted one of 3,361,847 and then make further adjustments due to cave-ins, clay pockets, etc. The correct figure for the total amount of underlying sand is 3,911,525 cubic yards. However a transpositional error was made in calculation of this amount and we arrived at a figure of 3,311,525 which we inadvertently accepted for the proper figure of 3,361,847.