**Elmer C. GRAFF & Cecilia A. Graff**

**v.**

**Bernard M. SCANLAN & Susan A. Scanlan, his wife, and John D. Norman & Elaine J. Norman, his wife, Appellants.**

Commonwealth Court of Pennsylvania.

Argued Oct. 16, 1995.

Decided March 22, 1996.

Timothy F. Hennessey, for appellants.

Leo H. Eschbach, for appellees.

Before DOYLE and SMITH, JJ., and SILVESTRI, Senior Judge.

DOYLE, Judge.

Bernard and Susan Scanlan and John and Elaine Norman appeal from an order of the Court of Common Pleas of Chester County confirming a report of a Board of View finding that a private road across portions of their properties should be opened.

The underlying facts, presenting an issue of first impression for the Court, are as follows. In 1974, Elmer and Cecilia Graff purchased a forty-two acre tract of land in East Coventry Township. In 1978, the Graffs filed a subdivision plan with the Township seeking to subdivide the upper portion of the tract into nine lots known as the Bruce's Hill subdivision (Bruce Hill). Lots 1 through 8 of Bruce Hill had access to Schoolhouse Road, a public roadway which bordered the westerly side of the subdivision. Lot 9 was adjacent to lots 6 and 8 and did not have direct access to any public road.

Abutting Bruce Hill to the northeast was another subdivision known as Fox Gate Farm in which the Scanlans owned lot 7 and the Normans owned lot 10. The Scanlans' lot 7 abutted the easterly side and the Nor-

mans' lot 10 abutted the southerly side of the Graffs' lot nine 9 in Bruce Hill. Both the Scanlans' and the Normans' lots had access to Fox Gate Drive, a public road whose terminus in Fox Gate Farm was a cul de sac.[1]

On May 15, 1978, at the Township meeting regarding Bruce Hill, the Board of Supervisors required the Graffs to obtain a Declaration of Easement from the Scanlans and the Normans in order to access Fox Gate Drive from lot 9 of Bruce Hill. No such declaration of easement was ever obtained by the Graffs. However, the Graffs subsequently approached the Scanlans and obtained from them a combination agreement of sale and an option for the Scanlans to purchase lot 9 of Bruce Hill. On June 19, 1978, the Board of Supervisors required the Graffs to revise the Bruce Hill plan to show that lot 9 could not be sold separately from the Scanlans' lot 7 of Fox Gate Farm. (Notes of Testimony (N.T.) at 36–37; Reproduced Record (R.R.) at 40a–41a.) On June 28, 1978, a notation reflecting this requirement was added to the Bruce Hill plan.[2] On July 3, 1978, the Board of Supervisors approved the Bruce Hill plan, including the notation requiring the conveyance of lot 9 to the Scanlans thereby connecting lot 9 to the Scanlans' property. (Minutes of the Board of Supervisors of East Coventry Township, July 3, 1978; R.R. at 56a.)

Between the time the Graffs laid out Bruce Hill in April of 1978 and sometime in 1984, the Graffs sold lots 1 through 7, but the one-year option to purchase lot 9 was never exercised by the Scanlans.

In July, 1984, the Graffs offered to purchase from the Scanlans a right-of-way across the Scanlans' property. When the Scanlans did not accept the offer, the Graffs filed an action in equity in August, 1984, in the Court of Common Pleas of Chester County alleging that they had an easement by express grant or, in the alternative, by implication across the Scanlans' and the Normans' property. Prior to the conclusion of this litigation, in July, 1985, the Graffs sold lot 8 of Bruce Hill. (Stipulation of Counsel at 2; R.R. at 70a.) The Graffs did not expressly reserve any right of access across lot 8 in favor of lot 9. (N.T. at 38; R.R. at 42a.) Accordingly, as of July, 1985, lot 9 had no direct access to a public road.

By order dated January 23, 1986, the Court of Common Pleas found that the Graffs had neither an express easement nor an implied easement over the Scanlans' and the Normans' properties in Fox Gate Farm, and denied the equitable relief.

On December 9, 1991, the Graffs filed a second suit with the Court of Common Pleas of Chester County, this time pursuant to Section 11 of the Private Road Act[3] in which the Graffs asked for a rule to show cause why a Board of View should not be appointed to determine the necessity of a private roadway from lot 9 in Bruce Hill through portions of both the Scanlans' and the Normans' properties in Fox Gate Farm in order to gain access to Fox Gate Drive. The Graffs' petition alleged that lot 9 of Bruce Hill was landlocked and, therefore, a private road over the Scanlans' and the Normans' properties was necessary. The petition also requested that upon a finding of necessity for such a road, that the opening of the same be directed. On December 9, 1991, the same day that the Graffs' petition was presented, the trial court issued the requested rule to show cause. On January 2, 1992, the Scanlans and the Normans filed an Answer, asserting first, that lot 9 has access to a public

---

1. The subdivision plans for Fox Gate Farm and Bruce Hill are attached as appendices.

2. The notation on the approved plan states:
 "Note: Lot # 9 shall be conveyed to Bernard M. & Susan Scanlon [sic] and shall not be sold seperately [sic] from the adjoining Scanlon land."
 (Bruce Hill Subdivision Plan; R.R. at 61a.)

3. Act of June 13, 1836, P.L. 551, *as amended,* 36 P.S. § 2731. Section 11 of the Act provides in pertinent part:

The several courts of quarter session shall, in open court as aforesaid, upon the petition of one or more persons ... for a road from their respective lands or leaseholds to a highway or place of necessary public resort, ... direct a view to be had of the place where such a road is requested, and a report thereof to be made, in the same manner as directed by the said act of thirteenth June, one thousand eight hundred and thirty-six.

36 P.S. § 2731.

road via an implied easement over lot 8 of Bruce Hill, and second, that the Graffs created their own predicament, *i.e.*, landlocked their own property, and, therefore, no remedy is available under the Act. Essentially, the Answer of the Scanlans and the Normans said that the Graffs painted themselves into a corner without a door.

The trial court, on January 4, 1993, entered an order appointing Viewers and directing that a view be conducted and a report issued. Following a view held on October 7, 1993, the Viewers issued a report wherein they made the following relevant findings of fact:

(a) That the premises of the Petitioner described as Lot # 9, Bruce's Hill, are indeed at this time landlocked, and a necessity for a 25-foot wide private road for access thereto is found to exist. The Board offers no comment as to how the necessity came to exist, opining that such is the business of the courts and outside the purview of the Board, despite the interesting testimony presented on this issue.

(b) That the most appropriate location for such a private road giving access to Petitioners' said premises is over the premises of both Respondents, parallel to and on the property line between their respective lots, and extending twelve and one half feet in breadth on each of the lots of the Respondents. The center line of the 25 foot-right-of-way to be the lot line dividing the premises of the respondents and the terminus thereof to be on the cul de sac of Fox Drive at the point where the said lot line intersects the same.

(Report of Board of View at 2–3; R.R. at 22a–23a.)

On November 24, 1993, the Scanlans and the Normans appealed the Viewers' report to the trial court which, by order dated November 16, 1994, confirmed the report and directed that a private road be opened as set forth therein. The trial court specifically concluded that although the Graffs did create the landlock of lot 9, such self-creation did not defeat their petition for a private road under the Act. The trial court also concluded that no easement by implication existed over lot 8

of Bruce Hill which would have precluded a finding of necessity for a private road over the properties of the Scanlans and the Normans. This appeal followed.

On appeal, the Scanlans and the Normans again argue that first, lot 9 of Bruce Hill is not landlocked because it is accessible to Schoolhouse road by virtue of an easement implied by operation of law over lot 8 in that subdivision and, second, the Graffs are precluded from obtaining an easement for a private road pursuant to the Act because they created their own hardship.

Section 12 of the Act provides:

If it shall appear by the report of viewers to the court directing the view, *that such road is necessary,* the said court shall direct what breadth the road so reported shall be opened, and the proceedings in such cases shall be entered on record, as before directed, and thenceforth such road shall be deemed and taken to be a lawful private road.

36 P.S. § 2732 (emphasis added).

■ In reviewing the applicable principles concerning the Act, we find that the Act is in the nature of eminent domain and, therefore, must be strictly construed. *Application of Little,* 180 Pa.Superior Ct. 555, 119 A.2d 587 (1956). "The word necessity, the key to this entire Act must likewise be given a strict interpretation." *Id.* at 559, 119 A.2d at 589. As such, our courts from early in the history of the Act have construed it as requiring the "strictest necessity." *Id.; see In re Road in Plum Creek Township,* 110 Pa. 544, 548, 1 A. 431, 433 (1885) ("[T]he taking of property for private use is an assumption that is *prima facie* unconstitutional, and can only be justified by the strictest necessity."). Otherwise, a board of viewers generally has broad authority under the Act to determine whether a private road is necessary. *In re Laying Out a Private Road, Appeal of Zeafla,* 405 Pa.Superior Ct. 298, 592 A.2d 343 (1991).

The Scanlans and the Normans challenge the necessity of the private road in question. We will first address the issue of whether the Graffs have an easement implied by necessity over lot 8 of Bruce Hill and, also, whether the existence of such an easement precludes

the finding of necessity under the Act for a private road over the Scanlans' and the Normans' properties.

■ An easement by necessity may be implied when "'after severance from adjoining property a piece of land is without access to a public highway.'" *Burns Manufacturing Co. v. Boehm,* 467 Pa. 307, 314 n. 4, 356 A.2d 763, 767 n. 4 (1976) (quoting *Soltis v. Miller,* 444 Pa. 357, 359, 282 A.2d 369, 370 (1971); *see also Bodman v. Bodman,* 456 Pa. 412, 321 A.2d 910, 912 (1974)).[4] In order to establish a way of necessity, three elements must be proven:

1. The titles to the alleged dominant and servient properties must have been held by one person.

2. This unity of title must have been severed by a conveyance of one of the tracts.

3. The easement must be necessary in order for the owner of the dominant tenement to use his land, with the necessity existing both at the time of the severance of title and at the time of the exercise of the easement.

4. Implied easements on the grounds of necessity must be distinguished from implied easements from a prior use (also referred to as easements by implied reservation). The two types of easements are often confused by both litigants and the courts because both easements require unity of ownership and subsequent severance. *See generally* 11 Am.Jur. Proof of Facts 3d 601, *Way of Necessity.* An easement by necessity arises upon a showing that there was a conveyance of a part of a tract of land in such a manner that the part conveyed or the part retained is denied access to a public road. Conversely, an implied easement from a prior use "[is] based on the theory that continuous use of a permanent right-of-way gives rise to the implication that the parties intended that such use would continue, notwithstanding the absence of necessity for the use." *Boehm,* 467 Pa. at 314 n. 4, 356 A.2d at 767 n. 4.

5. With respect to the *scope* of an implied easement by necessity, the Pennsylvania courts utilize a *reasonable* necessity standard, *i.e.,* the scope of the easement may be enlarged from its original use in order to meet "the reasonable needs . . . of the dominant estate for such a[n] . . . easement, and to vary with the necessity, in so far as may be consistent with the full reasonable enjoyment of the servient tenement." *Soltis,* 444 Pa. at 360, 282 A.2d at 371 (quoting Tiffany, *Real Property* 345 (3d ed. 1939)). For example, an easement by necessity originally implied for the use of a

11 Am.Jur. Proof of Facts 3d 601, *Way of Necessity* § 3.

■ Such an easement may be implied in favor of the grantor or grantee of the land. A grantee is entitled to an easement over the lands of his grantor where the property conveyed to him is "so situated that access to it from the highway cannot be had except by passing over the other land of the grantor." *Commonwealth v. Burford,* 225 Pa. 93, 98, 73 A. 1064, 1066 (1909). Similarly, a grantor is entitled to an implied easement by necessity when he grants away his exterior land thereby leaving his remaining land without an outlet. *Ogden v. Grove,* 38 Pa. 487 (1861).

■ An easement implied on the grounds of necessity is always of *strict necessity;*[5] it never exists as a mere matter of convenience. *Possessky v. Diem,* 440 Pa.Superior Ct. 387, 655 A.2d 1004 (1995). Further, an easement by necessity does not exist when an owner can get to his own property through his own land, and the necessity must not be created by the party claiming the easement. *Ogden.*[6]

horse and buggy may later be expanded in order to accommodate an automobile, as long as the expanded use does not unduly infringe on the use and enjoyment of the servient land.

6. An analysis of the facts of *Ogden* is instructive on this point. *Ogden* involved two adjacent landowners, Ogden and Grove, who took title to their respective properties from a common owner. Ogden owned lot 3 while Grove owned lots 1 and 2. Prior to severance of the three parcels, the common owner had built two multistory stores covering the entire street frontage of lot 3 thereby depriving the other structures (two warehouses and one stable) on that same lot access to a public road. In order to make full use of lot 3 the common owner used a paved alleyway which ran between lot 3 and lot 2 as a means of ingress and egress to the landlocked structures. After the common owner conveyed lot 3 to Ogden and lots 1 and 2 to Grove, Ogden continued to use the paved alleyway to access the three landlocked structures on lot 3. Shortly after severance, Grove brought suit against Ogden to prevent Ogden from continuing to use the paved alleyway, asserting that the alleyway was wholly situated on lot 2 and that Ogden had no right to its use. In response, Ogden argued that he had a right of way from necessity over the alleyway, asserting that the necessity for the use of the alleyway arose at the time of severance of lots 2 and 3. The Court found that Ogden was not entitled to an easement by necessity over the

In the instant case, the evidence of record establishes that: (1) there was a unity of title between lot 8 and lot 9 of Bruce Hill; (2) the unity was subsequently severed when the Graffs sold lot 8; (3) an easement is necessary in order for the Graffs to use lot 9 as it is undisputed that lot 9 is landlocked without such an easement; and (4) the necessity existed both at the time of the sale of lot 8 (severance of unity of title between the lots) and at the time the instant litigation was commenced.

■ Accordingly, although the Graffs failed to expressly reserve an easement, we hold that an easement implied by necessity arose at the time they sold lot 8.

■ We recognize that the "Act does not require an absolute necessity, such as being completely landlocked." *Little*, 180 Pa.Superior Ct. at 559, 119 A.2d at 589. Accordingly, the fact that the Graffs have an easement over lot 8, alone, does not defeat their right to proceed under the Act. However, "the mere inconvenience in the use of an existing road [or easement] is not enough.... The existing road [or easement] must be of a limited privilege [7] ... or 'extremely difficult and burdensome' in its use ... to warrant

the appropriation of another more convenient course." *Id.*

Therefore, in determining whether a private road was of "strictest necessity" over the property of the Scanlans and the Normans, the Board of View should have considered the fact that the Graffs had an implied easement by necessity over lot 8 [8] and should have also considered any legal or physical obstacles which precluded the Graffs from utilizing such an easement.[9] The failure of the Board to do so constituted error as a matter of law.

■ Nonetheless, we will not remand the case for this determination, because, even if the Graffs established a severe physical or legal limitation on their right to the implied easement over lot 8 of Bruce Hill and, therefore, the Board of View again determines that the Graffs are landlocked, the Graffs' petition under the Act must still fail because we hold that landowners who *voluntarily* create their own hardship are precluded from condemning a private road over the land of others pursuant to the provisions of the Act. In the instant case, it is uncontroverted that the Graffs systematically conveyed lots 1

---

alleyway because *the necessity was created by Ogden's predecessor in title, the common owner, when the two stores were built over the only existing street frontage of lot 3* and therefore, the necessity was self-created. The Court further stated that Ogden could get to the public road *through* the two stores notwithstanding the fact that Ogden would have to *destroy* the stores to do so.

7. For example, in *In re Laying Out a Private Road*, 405 Pa.Superior Ct. 298, 592 A.2d 343 (1991), the Superior Court held that an "irrevocable license" to an existing right of way does not negate a Board of View's finding of necessity for a private road because the license does not necessarily run with the land. Also, in *Kraft's Petition*, 33 Lanc.Rev. 386 (C.P.Pa.1916), the Court of Common Pleas of Lancaster County held that an express easement which is limited to haying time and the single purpose of cutting and removing hay does not negate the Board of View's finding of necessity for a private road.

8. *See In re Petition of Geary*, 40 Northumb.L.J. 50, 54 (C.P.Pa.1968) ("[T]he existence of a private road does not prohibit the petition for a Board of view for another private road ... but ... this fact must be considered by the Board of

Viewers with all pertinent factors in their determination of the necessity of the private road.")

9. The record indicates that the Graffs may have been prevented from exercising their right to an implied easement by necessity over lot 8 due to zoning violation(s). Mr. Graff testified as follows:

[Graff]: I petitioned the township to get a variance to get into lot 9 down through Mr. Dougherty's property.
THE COURT: Mr. Dougherty's?
[Graff]: Is the man who currently owns number 8. And the township would not allow me.
THE COURT: What kind of variance were you requesting, a variance with respect to the width of the necessary access?
[Graff]: Just the access to get in.
THE COURT: All right. In other words, you are saying that coming across lot number 8 would have violated zoning. You had asked for a variance from that requirement and were denied.
[Graff]: Yes sir.
(N.T. at 15–16; R.R. at 27a–28a.)

The substance of the alleged zoning violation(s) as well as the reason the zoning hearing board denied the Graffs' application for a variance is noticeably lacking in the record of the present appeal.

through 8 of Bruce Hill and failed to reserve an express easement over any of those lots, thereby depriving lot 9 of access to a public road. Accordingly, they are not entitled under the Act to a private road over the land of others.

The issue of whether a self-created landlock defeats a finding of necessity under the Act is one of first impression in Pennsylvania. Although our extensive survey of Pennsylvania case law reveals no authority directly on point, we find persuasive the analysis of the Louisiana Supreme Court in a factually similar case. In *English Realty Co. v. Meyer*, 228 La. 423, 82 So.2d 698 (1955), a landowner sought to condemn a right-of-way over his neighbor's property pursuant to Article 699 of the Louisiana Civil Code [10] which is substantively similar to our Pennsylvania Act. In 1950, the landowner had owned an eighteen-acre tract of land which he subsequently divided and sold, retaining only a five-acre parcel. The retained parcel was effectively landlocked because, although the parcel had a seven hundred foot frontage on Linwood Avenue, a public road, the City of Shreveport had refused to allow the landowner to enter Linwood Avenue from its property. Significantly, the city's refusal occurred *prior to* the landowner's conveyances which resulted in its landlock. The Louisiana Supreme Court reversed the trial court decision to grant the corporate landowner a right-of-way under the Code and held that a landowner who, by its own actions, deprives its estate of access to a public road, is not entitled to proceed under Article 699 of the Louisiana Civil Code. In this regard, the Louisiana Supreme Court stated:

[I]f plaintiff, by reason of the various property sales it has made, now finds itself in the position of holding acreage fronting that part of the overpass approach to which the City of Shreveport might be justified in refusing to grant it access from its property, it is nevertheless not entitled to claim passage over defendants' property as the situation respecting access of which it now complains was wholly created by its own act. Such circumstances, even if actual enclavement results, do not warrant the application of Article 699 of the Code as ... *its enclosure is not a direct consequence of the location of the land but of the act of the party seeking the relief.*

*Id.* 82 So.2d at 701 (emphasis added).

The *English Realty* decision was subsequently limited to its facts and distinguished from cases wherein the landowner's landlock resulted from selling parcels of its land to an expropriating authority pursuant to negotiations made in contemplation of condemnation proceedings. In such cases, the owner's landlock was not truly voluntary and, therefore, the landowner should "not be punished for its cooperation" with the condemning authority. *Lafayette Airport Commission v. Roy*, 265 So.2d 459, 465 (La.Ct.App.1972), *writ refused*, 262 La. 1160, 266 So.2d 444 (La.1972), *cert. denied*, 411 U.S. 916, 93 S.Ct. 1543, 36 L.Ed.2d 307 (1973).

Thus, the Louisiana courts only preclude a landlocked owner from condemning a private right of way over the land of its neighbor where the landowner originally had access to a public road and subsequently, and *voluntarily*, subdivided and sold parcels of its land so as to create a landlock of the land the owner retained.[11] We particularly observe

10. Article 699 of the Louisiana Civil Code provides:

The owner whose estate is enclosed, and who has no way to a public road, a railroad, a tramroad or a water course *may claim the right of passage on the estate of his neighbor or neighbors to the nearest public road,* railroad, tramroad or water course and shall have the right to construct a road, railroad or tramway according to circumstances and as the exigencies of the case may [require], over the land of his neighbor or neighbors for the purpose of getting the products of his said enclosed land to such public road, railroad, tramroad or water course, or for the cultivation of his estate,

but he shall be bound to indemnify his neighbor or neighbors in proportion to the damage he may occasion.

La.Civ.Code art. 699 (emphasis added).

11. In contrast to the private condemnation statutes in both Louisiana and Pennsylvania which require "strictest necessity," the private road statute in Georgia provides that a private road is available to a landowner who does not have a **"reasonable** means of access, ingress, and egress." *Kellett v. Salter*, 244 Ga. 601, 261 S.E.2d 597 (1979) (quoting Ga.Code Ann. § 83–101(b)). As such, the fact that a landowner creates his own landlock does not, alone, preclude

that in *English Realty,* as in the instant appeal, the original owner could have established access to a public road either by planning the subdivision in a different manner or by express reservation of an easement before selling off all other lots in the subdivision.

 In the instant case, the Graffs proceeded with the sale of lot 8 to Dougherty with full knowledge that the Scanlans and the Normans in Fox Gate Farm refused to grant the Graffs an easement in favor of lot 9 of Bruce Hill, that those owners could not be legally compelled to grant such an easement (on the grounds of express grant or implication), that the Township required the Graffs to either obtain such an easement or convey lot 9 to the Scanlans, and that the Graffs

*could have* reserved an easement over of the lots in Bruce Hill prior to the conveyance of those lots.[12] As such, the Graffs, like the landowner in *English Realty, voluntarily* created the landlock of their own property. Accordingly, we hold that the Graffs' self-created landlock of lot 9 of Bruce Hill cannot be the basis of a finding of "strict necessity" under the Act.

Order reversed.

## *ORDER*

NOW, March 22, 1996, the order of the Court of Common Pleas of Chester County in the above-captioned matter is hereby reversed.

---

the owner from condemning a private road under the Georgia statute. Rather, the Georgia courts will consider whether the landowner ever had a *reasonable* means of access through the lots he has sold. For example, in *Kellett,* the Georgia Supreme Court held that the landowner was entitled to condemn a private road over the land of his neighbor, even though the landowner could have expressly reserved an easement over adjacent lots he had previously owned and sold, because a road over these lots would have cost

$47,800, which was twice as much as the value of the land the owner retained.

12. The Graffs' actions in voluntarily *creating* their hardship are distinguishable from cases wherein the landowner *purchases* property with the *knowledge* that it is landlocked. In such a case, the purchaser's *knowledge* does not preclude a finding of "strict necessity" by the Board of View. *See, e.g., In re Private Road in Monroeville Borough,* 204 Pa.Superior Ct. 552, 205 A.2d 885 (1965).

APPENDIX

FOX GATE FARM
EAST COVENTRY TOWNSHIP
CHESTER COUNTY
PENNSYLVANIA

SCHOOLHOUSE ROAD T 525

COMONWEALTH OF PA, COUNTY OF CHESTER:
AT A MEETING HELD ON _____ 19___ THE
PLANNING COMMISSION OF EAST COVENTRY
TOWNSHIP APPROVED THE SUBDIVISION OF
THE PROPERTY AS SHOWN HEREON.

COMONWEALTH OF PA, COUNTY OF CH
AT A MEETING HELD ON _____ 19___
BOARD OF SUPERVISORS OF EAST COV
TOWNSHIP APPROVED THE SUBDIVISION
THE PROPERTY AS SHOWN HEREO

SILVESTRI, Senior Judge, dissenting.

Because I disagree with the majority's conclusion that a landowner's self-created landlock defeats a finding of necessity under the Private Road Act (Act),[1] I dissent.

Initially, it is noted that a board of viewers has broad authority under Section 11 of the Act, 36 P.S. § 2731, to determine the necessity of a private roadway. *In re Laying Out and Opening a Private Road, Appeal of Zeafla,* 405 Pa.Superior Ct. 298, 592 A.2d 343 (1991). In reviewing the viewers' decision, a trial court may confirm the report, or reject it and direct a view. *Id.* Appellate review is limited to ascertaining the validity of the court's jurisdiction, the regularity of the proceedings, questions of law and whether there has been an abuse of discretion. *In re Private Road in Greene Township,* 343 Pa.Superior Ct. 304, 494 A.2d 859 (1985).

There is nothing in the Act or in the cases of this Commonwealth which limits a party who has caused their property to become landlocked from obtaining a private roadway through a neighboring property to gain access to a public road. In *In re Petition for a Private Road in Monroeville Borough,* 204 Pa.Superior Ct. 552, 555, 205 A.2d 885, 886 (1964), the court rejected an argument that a landowner who purchased property knowing it to be landlocked should be prevented from utilizing the Act for a private right of way through adjacent property. The court in rejecting this argument pointed out the absurdity which would result if such an argument were successful. The court stated:

[W]e have failed to find in the road acts any indication of legislative intention to distinguish between persons who acquire land with knowledge and persons who acquire land without knowledge of its landlocked condition. That land is landlocked would come to the attention of all purchasers by an inspection of the property or by an examination of the public records. *If appellant's contention were tenable, it would mean that only those property owners whose access to a public road was shut off either by a sale of part of their property or by some public improvement, the latter*

*of which occurred in the present case, should have the benefit of the acts.*

As in *Monroeville Borough,* here too, an absurd situation results if, as the majority concludes, persons whose property becomes landlocked through their own actions are prevented from seeking relief under the Act. Would such a limitation apply to all subsequent purchasers of the property thereby making the property, essentially, unusable? Clearly not, as the foregoing case demonstrates that one who purchases landlocked property with the knowledge of its landlocked condition is not prevented from obtaining a private right of way over lands of another.

The majority, in footnote 12, acknowledges the *Monroeville Borough* line of cases, but distinguishes between landowners who purchase landlocked property with the knowledge of its landlocked condition and those who own property and create a landlock on their property. However, to make a distinction between a subsequent purchaser and a present owner who creates the landlock does not serve the purposes of the Act, as such a distinction focuses entirely upon the individual bringing the action. This is inconsistent with the case of *Waddell's Appeal,* 84 Pa. 90 (1877), wherein the Supreme Court pointed out that the rights of the individuals involved in the proceedings to open a private road are not the exclusive consideration to be given. In *Waddell,* the court noted the following:

The right of the legislature to establish private roads over the land of one man for the benefit of another, for the purpose of access to highways or places of necessary public resort, or even to private ways leading to highways, has never been seriously doubted in Pennsylvania.... [I]t is the connection of these private ways with public highways, or with places of necessary public resort, together with the implied right or license of the public to use them, at least in going to and from the premises of the person laying them out, *quite as much, if not more, as the consideration of purely individual rights,* that have won for

---

1. Act of June 13, 1836, P.L. 551, *as amended,* 36 P.S. §§ 2731–2891.

these acts judicial recognition of constitutionality.

*Waddell,* 84 Pa. at 93–94.

Accordingly, the fact that a resulting landlock is "self-created" should not preclude a landowner from gaining a private right of way through an adjacent property owners' land in order to access a public roadway; to hold otherwise, as the majority does, is illogical, absurd and purely punitive since subsequent purchasers with knowledge of the landlocked situation can obtain relief under the Act.

Based upon the foregoing, I would conclude, within our narrow scope of review, that the trial court's confirmation of the Viewers' report was proper.